Patrick IRELAND, Plaintiff,

v.

JEFFERSON COUNTY SHERIFF'S DEPARTMENT; Board of County Commissioners of the County of Jefferson, Colorado; Jefferson County Sheriff John C. Stone, individually and in his official capacity; Former Jefferson County Sheriff Ronald Beckham, individually and in his official capacity; Neil Gardner, individually; John Healy, individually; John Hicks, individually; Mark M. Miller, individually; Tanya Williams, individually; Mike Guerra, individually; Philip Lebeda, individually; John Dunaway, individually; Terry Manwaring, individually; David Walcher, individually; John Kiekbusch, individually; John or Jane Does 1 Through 100 (Deputies in the Jefferson County Sheriff's Department), individually; Jefferson County School District R–1; Howard Cornell, individually and in his official capacity; James D. Tanner d/b/a Tanner Hunting and Fishing Shows f/k/a Tanner Gun Shows, individually; Ronald Hartman, individually; and James Washington, individually, Defendants.

No. CIV.01–B–1058.

United States District Court, D. Colorado.

March 26, 2002.

Stephen C. Peters, Lindquist & Vennum, P.L.L.P., Denver, CO, for Patrick Ireland.

William J. Kowalski, Susan S. Schermerhorn, William Stuart Stuller, Caplan & Earnest, L.L.C., Boulder, CO, for Jefferson County School Dist. R–1.

Lori Mary Moore, Retherford, Mullen, Johnson & Bruce, Colorado Springs, CO, Malcolm S. Mead, Hall & Evans, U.S. Dist. Court, Denver, CO, for James D. Tanner.

Michael R. Waters, Jones & Waters, LLC, Colorado Springs, CO, for Ronald Hartman.

Gordon Lamar Vaughan, Vaughan & DeMuro, Colorado Springs, CO, for James Washington.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendants Jefferson County Sheriff's Department (JCSD or Sheriff's Department), Jefferson County Sheriff John C. Stone, individually and in his official capacity, former Jefferson County Sheriff Ronald Beckham, individually and in his official capacity, Neil Gardner, individually, John Healy, individually, John Hicks, individually, Mark M. Miller, individually, Tonya Williams (incorrectly spelled in the caption as Tanya), individually, Mike Guerra, individually, Philip Lebeda, individually, John Dunaway, individually, Terry Manwaring, individually, David Walcher, individually, and John Kiekbusch, individually (collectively, Sheriff Defendants) move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all claims brought by Plaintiff Patrick Ireland. In a separate Rule 12(b)(6) motion, Defendants Jefferson County School District R–1 (School District) and Howard Cornell, individually and in his official capacity, (collectively, School Defendants), also seek dismissal. In separate Rule 12(b)(6) motions, Defendants James D. Tanner d/b/a Tanner Hunting and Fishing Shows, f/k/a Tanner Gun Shows, Ronald Hartman and James Washington (collectively, Gun Show Defendants) also move for dismissal. Oral argument is unnecessary to determine the motions. After consideration of the motions and briefs and for the following reasons, I grant all motions except those of Defendants Hartman and Washington.

### I.

### Facts

#### A. General Allegations

The following facts are alleged in Plaintiff's Complaint. These allegations closely parallel and mirror in many respects those set forth in numerous related cases. *See e.g., Castaldo v. Stone,* 192 F.Supp.2d 1124 (D.Colo.2001); Case No. 00–B–790, *Schnurr v. Board of County Comm'rs;* and Case No. 00–B–806, *Ruegsegger v. Jefferson County Bd. of County Comm'rs.*

On April 20, 1999, at approximately 11:20 a.m., Plaintiff, a Columbine High School (School) student, was shot and seriously injured in the school library (Library), C/O ¶¶ 1, 21, by fellow students Dylan Klebold or Eric Harris. *Id.* at ¶ 21. The attack, apparently in the planning stages for more than a year, involved meticulous preparations, including selection of a date, design of a scheme, surveillance of school activities, acquisition of bomb-making supplies, acquisition and modification of firearms, shooting practice, and transportation and delivery of bombs to the School. C/O ¶ 25. Harris' and Klebold's actions resulted in the deaths of twelve students and one teacher, and serious physical injuries to some twenty-six others, including Patrick Ireland. *Id.* at ¶ 20.

## B. Sheriff Defendants

### 1. Investigating Sheriff Defendants

Sheriff Stone has served as the Sheriff of Jefferson County, Colorado since January 1999. C/O ¶ 4. Sheriff Beckham was the Sheriff of Jefferson County, Colorado at all material times until January 1999. *Id.* at ¶ 5.

Defendants Stone, Beckham, Gardner, Hicks, Miller, Williams, Healy, Guerra, Lebeda and unidentified John and Jane Does 1–59 are collectively referred to as Investigating Defendants.

Plaintiff alleges that in approximately February 1998, Eric Harris and Dylan Klebold broke into a van to steal tools. C/O ¶ 37. The two were apprehended by the Sheriff's Department, prosecuted by the Jefferson County District Attorney, and placed in a Jefferson County juvenile offender diversion program on approximately March 25, 1998. *Id.*

According to Plaintiff, on or about March 18, 1998, shortly before Harris and Klebold were placed in the diversion program, Defendant Deputy Miller received a complaint from Randall Brown, a Jefferson County citizen, that Eric Harris often talked about making pipe bombs and using them to kill numerous people and that Klebold knew of Harris' bomb making activity. C/O ¶ 38. Mr. Brown and his wife also told Deputy Miller that Harris maintained a website. *Id.* Mr. Brown gave Deputy Miller a printout of information on Harris' website containing: 1) death threats including statements that Harris and Klebold were planning to use pipe bombs to kill numerous people; 2) a description of a pipe bomb detonated by the pair; 3) detailed descriptions of multiple pipe bombs built by Harris and Klebold; 4) explicit threats to shoot and kill people; 5) reference to killing using a sawed-off shotgun; 6) threats to "go to some downtown area in some big … city and blow up and shoot everything I can;" and 7) threats to rig up and detonate explosives and shoot numerous people. C/O ¶ 38.

It is alleged that after meeting with the Browns, Deputy Miller completed an incident report to which the website printout was attached and submitted it to his supervisor, Sgt. Lebeda. *See* C/O ¶ 39. Sgt. Lebeda designated that the incident report and the attached website information was to be sent to Deputy Gardner, assigned full-time to Columbine High School as a student resource officer. *Id.* at ¶ 40. Plaintiff alleges that a copy of Deputy Miller's report was forwarded to Deputy Gardner and that he was briefed on the reports. *Id.* at ¶ 41.

The Complaint states that Deputy Gardner knew or should have known information available to Columbine teachers and school officials about bizarre, hate-filled and threatening behavior of Harris and Klebold. *Id.* at ¶ 42. This information included but was not limited to video tapes made by Harris and Klebold showing them: 1) in possession of and discharging firearms; 2) in a mock attack on Colum-

bine students; and 3) killing Columbine students. *See id.* at ¶ 42.

In the alternative, Plaintiff alleges that Deputy Gardner and other Sheriff Defendants never informed any teachers, deans, administrators or other school officials of the conduct reported by the Browns or of the contents of Harris' website. C/O ¶ 47.

Deputy Hicks, assigned to investigate the website information, C/O ¶ 117, met with Mr. and Mrs. Brown and bomb squad deputies, including Deputy Guerra. *Id.* at ¶ 49. Deputies Healy and Williams were also assigned investigative duties concerning Harris' and Klebold's activities, including the website. *See id.* at ¶ 50. Apparently the Sheriff's Department unsuccessfully attempted to access the Website. *See* Exhibit A. Plaintiff alleges that the Website remained accessible until after the attack. *Id.* at ¶ 65.

Prior to April 20, 1999, Harris added the following information to the Website on "information panels":

| | |
|---|---|
| Hobbies: | Preparing' for the big April 20! You'll all be sorry that day. |
| Occupation: | Senior at CHS and the rest is still unpublished. |
| Personal Quote: | when in doubt, pull it out. (computers) ——shut up and shoot it— quit whining, it's just a flesh wound —— Kill Em AALLLL!!!! |

*Id.* at ¶ 67. The Complaint does not contain the date this information was added or if the statements were made together or separately.

At some point after the meeting between Deputy Hicks and the Browns, initial steps were taken to prepare and obtain a search warrant in connection with Harris' activities. *See* C/O ¶ 53. Ultimately, the search warrant application was halted by "someone in a position of authority in the Department." *Id.* At approximately the same time, all follow-up on the Brown's complaint was "apparently ceased." *Id.* at ¶ 54. Plaintiff alleges that investigation of the Browns' report and the website was

intentionally and deliberately aborted by someone in a position of authority in the Sheriff's Department for reasons unrelated to legitimate law enforcement considerations. C/O ¶¶ 57–58.

### 2. Command Defendants

Defendants Stone, Dunaway, Manwaring, Walcher, Kiekbusch and unidentified John and Jane Does 51–100 (collectively, Command Defendants) were the officers in charge of the JCSD's response to the Columbine attack on April 20, 1999. At approximately 11:17 a.m. on April 20, 1999, Harris and Klebold walked from an adjacent parking lot toward Columbine High School's southwest entrance doors. Each carried a shotgun and various homemade explosive devices. Harris also carried a 10–shot Hi–Point model carbine rifle, while Klebold carried an Intratec TEC DC–9 semiautomatic pistol. C/O ¶ 96.

As they neared the School, Harris and Klebold began shooting students, killing two and wounding approximately seven others. C/O ¶ 97. Notified of the shots, Deputy Gardner, the school resource officer, drove his vehicle onto the grass within 30–40 yards of the entrance doors, where he and another arriving Sheriff's deputy exchanged shots with Harris and/or Klebold, who were positioned on the walkway leading to those doors. *Id.* at ¶ 98. As these deputies took cover, Harris and Klebold walked through the doors into the school building. *Id.*

Upon entering the School, Harris and/or Klebold shot a student and a teacher and then proceeded to walk down the long hallway toward the administrative area near the front entrance of the school, shooting and throwing small home-made explosives as they walked. C/O ¶ 99. Several minutes later they reversed their course, walking toward the cafeteria or "commons" area adjacent to the southwest

doors through which they had entered. *Id.*

At or about 11:21 a.m., the first 911 calls from witnesses at the scene were received in the Littleton Combined Communication Center from which they were routed to the Sheriff's Department. C/O ¶ 100. Some or all of the Command Defendants arrived at the scene at or about 11:30–11:45 a.m. and took command and control of the scene on behalf of the Sheriff's Department. *Id.* at ¶ 101. Plaintiff alleges that one or more of the Command Defendants directed that the Department's "Mobile Command Post and Communications Vehicle," used as the Department's "command post," be parked at a "staging area" located approximately one-third of a mile northwest of the school and visually separated from it by a strand of trees where it remained throughout the afternoon. C/O ¶ 102.

Defendant Kiekbusch, at the direction of and/or with the approval and knowing acquiescence of Defendant Stone, assumed the role of "Police Operations Officer" in command and control of all SWAT, police, bomb squad, emergency medical (EMS) and fire rescue personnel, equipment and resources upon his arrival at the scene at or about 11:30 a.m., and continued to assume that role throughout the afternoon of April 20, 1999. C/O ¶ 103. Defendant Dunaway, at the direction and/or with the approval and knowing acquiescence of Sheriff Stone, also assumed and exercised command and control of SWAT, police, bomb squad, EMS and fire rescue personnel, equipment and resources upon his arrival at the scene. *Id.* at ¶ 104. Defendant Manwaring, at the direction and/or with the approval and knowing acquiescence of Sheriff Stone and Deputy Sheriff Kiekbusch, assumed the next-in-command role of "Incident Commander" when he arrived at the scene. *Id.* at ¶ 105. Defendant Walcher, also at the direction and/or with the approval and knowing acquies-cence of Sheriff Stone and Deputy Sheriffs Kiekbusch and Manwaring, replaced Defendant Manwaring as Incident Commander when Deputy Manwaring left the staging area to approach the building with a SWAT team at or about 1:00–2:00 p.m.

In response to the many 911 calls issuing from Columbine, police, fire rescue, and EMS vehicles and personnel began gathering in the vicinity of the school as early as 11:30 a.m. C/O ¶ 107. Allegedly, the Command Defendants directed all responding police, including SWAT teams, fire and rescue personnel to report to and stay within the "staging area" until ordered otherwise. *Id.* at ¶ 108.

The emergency response to the scene was massive and swift, consisting of several fire trucks, forty eight rescue/ambulance vehicles, two rescue helicopters, and approximately one hundred sixty five EMS and fire rescue personnel. The Complaint alleges that until late in the afternoon, most of these personnel, along with their vehicles, equipment and resources, were confined to the "staging area" by the Sheriff's Department and the Command Defendants. C/O ¶ 110. The Sheriff's deputies, acting in accordance with the policies and procedures of Sheriff Stone and the Sheriff's Department and acting on orders from the Command Defendants, refused to pursue Harris and Klebold into the school, even though Harris and Klebold continued to kill and injure unarmed students and teachers inside the school. C/O ¶ 116. According to Plaintiff, encountering no police resistance or opposition after entering the school building at approximately 11:25 a.m., Harris and Klebold continued their assault inside the School for the better part of an hour. *See* C/O ¶ 117.

At or about 11:30 a.m., Harris and Klebold entered the Library. Teacher Patti Nielson was in the Library and made a 911 call to the Sheriff's Department about the

time Harris and Klebold entered the Library. C/O ¶ 120. It is alleged that Ms. Nielson, who herself was shot, was on the telephone with the Sheriff's Department for approximately five minutes before the first student was murdered in the library. *Id.* The Complaint states that the telephone call lasted more than twenty minutes. *See* id.

Plaintiff alleges that even though the 911 operator, John Doe # 56, knew Ms. Nielson was injured, Harris and Klebold were systematically executing students in the Library, a fire alarm had gone off in the Library and the room was filling with smoke, the 911 operator, acting on the orders and instructions from the Sheriff Defendants, instructed Ms. Nielson to keep the students in the Library and told her that there was "help on the way." *See* C/O ¶ 122. Ms. Nielson relayed the 911 operator's instructions to the students in the library, including Plaintiff. *Id.* at ¶ 123. He alleges that as a result of the 911 operator's instructions, he and the other students did not help themselves by escaping through readily available exits. As a result, the window of opportunity for escape was lost. *Id.*

Plaintiff alleges that the 911 operator and other Sheriff's Department Defendants knew that Harris and Klebold were systematically killing and wounding students in the Library, and the Command Defendants knew that law enforcement personnel had no intention of going to the aid of the persons in the Library. Moreover, despite such knowledge, neither the 911 operator nor any Sheriff's Department personnel ever withdrew their orders to keep the persons in the Library pending the promised rescue. *See* C/O ¶ 124.

It is further alleged that at some point after Harris and Klebold entered the School, but before the pair entered the Library, the Sheriff's Department and the Command Defendants made a deliberate and intentional decision to limit the response of law enforcement officers at the School to "securing the perimeter," although they knew students and teachers, including Ms. Nielson, were being killed and injured in the School. *See* C/O ¶ 125. Consistent with this decision, the Command Defendants issued orders that all law enforcement officers were to leave the School and those poised to enter the School to remain outside even though they knew that the students in the Library had been told to remain in the Library and that help was on the way.

Several minutes after first entering the Library, Harris or Klebold went to the windows and shot out several of the windows. The law enforcement personnel at the scene made no response. Harris and Klebold then returned to their attack on the students in the Library. C/O ¶ 126.

Plaintiff alleges that law enforcement officials never came to aid of the persons in the Library despite the personnel and specialized equipment available by noon on April 20, 1999. *See* C/O ¶ 130. The Command Defendants prohibited their use or deployment for stopping Harris and Klebold or for search and rescue efforts of Plaintiff and other injured persons in the School. *See id.* Rather, the Command Defendants issued orders preventing Harris and Klebold from being stopped by surgical sharpshooters or from being distracted or interrupted by use of available diversionary devices. Similarly, Deputy Sheriffs Kiekbusch, Manwaring, Dunaway and/or Walcher, with the approval, authorization and/or knowing acquiescence of Sheriff Stone, issued orders preventing the use of available breaching equipment including battering rams, sledgehammers and rappelling gear or deployment of SWAT personnel to reach or rescue the persons in the Library. *See* C/O ¶ 131.

After a heated exchange with members of a reportedly impatient SWAT unit from a neighboring jurisdiction, the Command Defendants reluctantly agreed to allow deployment of two non-Jefferson County SWAT units into the School. *See* C/O ¶ 133. Neither SWAT team was sent to the Library while Plaintiff was in the School. *Id.*

According to Plaintiff, for a period of approximately four hours after Harris and Klebold began their attack and three hours after Harris and Klebold killed themselves in the Library, the Command Defendants prohibited any EMS personnel or fire rescue units from entering the School. C/O ¶ 134. By the time any rescue efforts began, the seriously injured Plaintiff had been in the Library for several hours as he pushed himself across the floor with his left leg as his right side was paralyzed. He finally escaped by climbing out a window and falling to the ground. *See id.*

## C. School Defendants

As Director of Security and Risk Management for Defendant Jefferson County School District R–1, Defendant Cornell (collectively, School Defendants) was responsible for providing security policies, procedures and enforcement concerning the safety of Columbine students. *See* C/O ¶¶ 12, 80–81. According to Plaintiff, "various District R–1 employees knew of or suspected Harris' and Klebold's hateful and violent tendencies." C/O ¶ 82.

Plaintiff alleges that for more than a year before the attack, Columbine officials knew, as did numerous students, about Harris and Klebold talking about blowing up the School. *Id.* at ¶ 85. It is alleged in the alternative that the Columbine personnel and/or the School Defendants were aware of the contents of Harris' website well before April 20, 1999. *Id.*

Plaintiff alleges further that if the School Defendants had exercised a degree of care, they would have assembled the following information:

-Harris' and Klebold's probationary status on the van break-in conviction

-the contents of Klebold's "vicious" English paper

-Harris' story from the perspective of a shotgun "bullet"

-other violent English class papers and discussions

-Harris' and Klebold's bomb-making activity and know how

-Harris' death threats

-Harris' violent and murderous rantings

-Harris' and Klebold's possession and use of firearms

-Harris' and Klebold's talk of violence, guns, and killing in at least four different classes

-Harris' and Klebold's video enactments of shooting people

-Harris' and Klebold's video enactments of blowing up the School

-Malevolent writings of Harris and Klebold stored on the School's network server

*See id.* at ¶ 86.

## D. Defendants Washington, Hartman and Tanner

Defendants Hartman and Washington shared a sales booth at which they sold guns at the Tanner Gun Show held in the winter of 1998 at the Denver Merchandise Mart. C/O ¶ 90. On November 22, 1998, Robyn Anderson, an eighteen year old female, approached Defendants' booth, accompanied by Harris and Klebold, both of whom were minors. *See* C/O ¶ 91. Allegedly, as the three approached the sales booth, either Mr. Hartman or Mr. Washington asked Harris and Klebold if they had brought "someone eighteen years old

this time." *Id.* at ¶ 92. Mr. Hartman and/or Mr. Washington then had a conversation with Harris and Klebold regarding a particular shotgun for sale at their booth. *Id.* at ¶ 93. Specifically, Plaintiff alleges also that Mr. Hartman and/or Mr. Washington told Harris and Klebold how to cut down the barrel of the shotgun. *Id.*

According to the Complaint, Mr. Hartman and/or Mr. Washington then checked Ms. Anderson' identification confirming that she was eighteen years old. C/O ¶ 94. Klebold then withdrew cash from his wallet and gave Mr. Hartman and/or Mr. Washington the price of the shotgun. *Id.* Mr. Hartman and/or Mr. Washington then handed the shotgun to Klebold who then left with it. *Id.* Plaintiff alleges that Klebold shot him in the head with the shotgun purchased from Mr. Hartman and Mr. Washington. *See id.* at ¶ 95.

## II.

### Claims

Based on these allegations, Plaintiff asserts the following claims:

#### Claim One

42 U.S.C. § 1983—Deprivation of right to life, liberty, and property without due process of law or equal protection against individual Sheriff Defendants Stone, Beckham, Gardner, Hicks, Miller, Williams, Guerra, Healy, Lebeda and John or Jane Does 1–50, in their individual capacities—failure to investigate based on creating or substantially enhancing the danger faced by Plaintiff and special relationship

#### Claim Two

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department, based on inadequate policies, practices, and training

#### Claim Three

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against Howard Cornell, individually based on creating or substantially enhancing the danger faced by Plaintiff and special relationship

#### Claim Four

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against the Jefferson County School District R–1, for inadequate policies, customs, practices, and training

#### Claim Five

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against individual Sheriff Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John or Jane Does 51–100, in their individual capacities, based on actions and/or failures to act on April 20, 1999—special relationship

#### Claim Six

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against individual Sheriff Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John or Jane Does 51–100, in their individual capacities, based on failure to remedy subordinates'/colleagues' deprivations of constitutional rights

#### Claim Seven

42 U.S.C. § 1983—Municipal Liability against Defendants The Board of County Commissioners of the County of Jefferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado based on acts of policymaker Sheriff Stone in his official capacity—deliberate indifference to deprivation of civil rights

#### Claim Eight

42 U.S.C. § 1983—Municipal Liability against Defendants The Board of County Commissioners of the County of Jef-

ferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado, based on acts of policymaker Sheriff Stone, in his official capacity— failure to prevent witnessed constitutional violations

***Claim Nine***

Negligence against Defendants Ronald F. Hartman and James R. Washington

***Claim Ten***

Negligence against Defendant James D. Tanner d/b/a Tanner Hunting and Fishing Shows f/k/a Tanner Gun Shows

Defendants move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss all federal claims for failure to state claims upon which relief can be granted. Further, the individual Sheriff Defendants, accepting as true Plaintiff's well pleaded facts, assert entitlement to qualified immunity from suit as to the § 1983 claims. Defendants Washington, Hartman and Tanner seek dismissal of Plaintiff's state law negligence claims for the reasons set out below.

### III.

### Fed.R.Civ.P. 12(b)(6)

 Under Rule 12(b)(6), I may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pleaded facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* I accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party. *See Maher v. Durango Metals*, 144 F.3d 1302, 1304 (10th Cir.1998). All reasonable inferences must be construed in the plaintiff's favor. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir.1998).

### IV.

### Qualified Immunity

All individual Sheriff Defendants maintain they are entitled to qualified immunity from Plaintiff's Claims One, Five and Six brought pursuant to 42 U.S.C. § 1983. Defendant Cornell does not assert he is entitled to qualified immunity from Claim Three.

The sequential analysis of the law of qualified immunity is fully set forth in the related *Castaldo, Schnurr* and *Ruegsegger* cases as well as in the related case of *Sanders v. Board of County Comm'rs*, Case No. 00–B–791, 2001 WL 1808537, —— F.Supp. ——. Application of that law to the circumstances alleged here leads me to conclude that the Sheriff Defendants, sued in their individual capacities are entitled to qualified immunity.

### V.

### Claims Against the Sheriff Defendants

A. ***Claim One***—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against individual Sheriff Defendants Stone, Beckham, Gardner, Hicks, Miller, Williams, Guerra, Healy, Lebeda, in their individual capacities -failure to investigate based on creating or substantially enhancing the danger faced by Plaintiff and special relationship—duty to protect Columbine High School students

 The Investigating Defendants move to dismiss Claim One in which Plaintiff asserts a substantive due process violation based on alleged improper investigative efforts by Defendants. For the following reasons, I grant the motion.

In Case No. 00–B–1611, *Castaldo v. Stone*, § V(B), Plaintiffs brought the identical claim against the individual investi-

gating Sheriffs, Sheriff Stone and Former Sheriff Beckham based on the same legal theories and core facts. In *Castaldo*, I concluded that Plaintiffs failed to establish the requisite special relationship. As to the danger creation doctrine, I concluded that Plaintiffs had not met the factors set out in *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir.1995), *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996). For the reasons set out in *Castaldo*, which are incorporated by reference into this Memorandum Opinion and Order, I conclude that Plaintiff was not in a special relationship with the Investigating Defendants. Nor have all five *Uhlrig* factors been satisfied. Thus, the Investigating Defendants, including Sheriff Stone and Former Sheriff Beckham, are entitled to dismissal of Claim One. Qualified immunity also attached to their actions for the reasons stated in *Castaldo v. Stone*. See ¶ VI.

**B. *Claim Five*–42 U.S.C. § 1983–Deprivation of right to life, liberty, and personal security against individual Sheriff Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John or Jane Does 51–100, in their individual capacities based on actions and/or failures to act on April 20, 1999–special relationship**

■ Plaintiff contends that through the 911 operator, the Command Defendants restrained him from leaving the Library by instructing him to stay in the Library and await help. As a result, he claims the Command Defendants' actions and/or failures to act violated the Fourteen Amendment to the United States Constitution by depriving him of any chance to: 1) seek escape from Harris and Klebold before he was shot; and/or 2) obtain timely emergency medical treatment that would have alleviated his damages and suffering as a result of being shot by Harris and/or Klebold. *See* C/O ¶¶ 205,207. I analyze each situation separately.

1. Inability to Escape

Based on allegations that the Command Defendants took "functional custody of, and exerted physical control over [him]" coupled with their "false assurances that help was on the way," Plaintiff contends that pursuant to *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Command Defendants stood in a "special relationship" with him giving rise to the constitutional duty to protect and care for him. *See id.* at 199–200, 109 S.Ct. 998; 207–08. I disagree.

According to Plaintiff, the 911 operator, through teacher Patti Nielson, was in telephone contact with the occupants of the Library. *See* C/O ¶ 121. It is alleged that in response to the direction of Sheriff Stone or other Command Defendants, the 911 operator: 1) assured Ms. Nielson that Deputy Sheriffs, EMS personnel and fire rescue personnel were on the way (a true statement); *see* C/O ¶ 123; and 2) instructed Ms. Nielson to "keep the students in the Library." *Id.* Ms. Nielson conveyed this information to the students in the Library, including Plaintiff. *Id.* at ¶ 123. At the same time, the Command Defendants prevented the Denver SWAT team and other potential rescuers from entering the Library. *Id.* at ¶¶ 124, 128.

Allegedly, as a direct result of these communications, Plaintiff and other occupants of the Library did not avail themselves of the opportunity to escape through readily available exits. *See* C/O ¶ 124. After Harris and Klebold entered the Library, they shot several students, including Plaintiff.

The Command Defendants maintain that these allegations do not amount to restraint as contemplated by *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). I agree.

In *Schnurr v. Board of County Comm'rs,* Case No. 00–B–790, 2001 WL 1808536, 189 F.Supp.2d 1105, I held as a matter of law that neither the 911 operator's communications nor the Defendants' expressions of intent to help gave rise to a special relationship as contemplated by the United States Supreme Court. Based on essentially identical allegations, and for the reasons stated in *Schnurr,* which are incorporated by reference into this Memorandum Opinion and Order, I conclude that: 1) the Command Defendants were not in a special relationship with Plaintiff; and 2) the alleged actions of the Command Defendants are not shocking in the constitutional substantive due process sense. Thus, the Command Defendants are entitled to dismissal of Claim Five.

### 2. Timely Medical Treatment

Plaintiff alleges that the Command Defendants issued orders at approximately 11:30 a.m. on April 20, 1999 forbidding police, SWAT, fire, EMS or other rescue personnel from attempting to enter the School without their express permission. *See* C/O ¶ 128. According to Plaintiff, these orders were continually enforced until approximately three hours after Harris and Klebold committed suicide. Hence, no rescue or SWAT units were sent to the Library while Plaintiff was in the Library. *See id.* ¶ 133. By the time rescue efforts were mounted, Plaintiff had escaped from the Library by pushing his half-paralyzed body across the floor, climbing out a window and falling to the ground. *See id.* at ¶ 134–36. He claims that but for the Command Defendants' actions and decisions on April 20, 1999, "his injuries and suffering would not have been exacerbated while he awaited promised rescue and medical aid that never came." *See* C/O ¶ 135.

Plaintiff argues that the allegations that Command Defendants' "actions and conscious disregard of the desperate predicament of the seriously injured people in the School, including him, exacerbated his injuries and suffering form a separate and alternative basis for holding these Defendants' liable under both the "state created/enhanced danger" exception and "special relationship" exception to the *DeShaney* holding." *See* Response Brief, p. 21. I disagree.

#### a. Special Relationship

For the reasons stated in § V(B)(1), *supra,* I conclude that the Command Defendants were not in a special relationship with Plaintiff.

#### b. Danger Creation/Enhancement

Although the danger creation/enhancement exception is not expressly stated as a basis for liability in Claim Five, the parties addressed this exception in their briefs. Out of an abundance of caution, I analyze this exception to *DeShaney's* limitation of liability for failure to protect citizens from private violence.

In *DeShaney,* the Court stated that:

> [w]hile the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*

*DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 (emphasis added).

Courts have grappled with the question of what state conduct "creates or enhances" danger sufficient to establish a duty to protect. In *Medina v. City and County of Denver,* 960 F.2d 1493 (10th Cir.1992), the Tenth Circuit explained that police officers who engaged in a high speed car chase that resulted in injuries to a bicyclist could be liable for creating a special danger faced by the bicyclist. *Id.* at 1495–99.

The Tenth Circuit also addressed directly the state-created or enhanced danger

doctrine in *Graham v. Independent School Dist. No. I–89*, 22 F.3d 991, 994 (10th Cir.1994) concerning acts of violence at two schools. At one school, a student was shot and killed by another student. At the other school, a student was stabbed by a fellow student. The students' parents brought separate § 1983 actions against their respective School Districts which were consolidated on appeal.

The *Graham* Court noted that *"DeShaney* ... le[ft] the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger," *citing Reed*, 986 F.2d at 1125 and *Dwares v. City of New York*, 985 F.2d 94, 99 (2nd Cir.1993). Citing *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), the Court stated that "[this state-created danger] doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Graham* at 995. Based in part on the plaintiffs' failure to point to any affirmative actions by defendants that created or increased the danger to the victims, the Court affirmed the district court's dismissal of the plaintiffs' complaints.

■ The contours of this doctrine were further explored in *Uhlrig*, 64 F.3d 567 in which the husband of a therapist killed by a mental hospital patient filed a § 1983 action asserting that the state's decision to terminate a special unit created the danger that led to his wife's death. The *Uhlrig* Court articulated a five-part test to determine whether a defendant created or enhanced the danger for the plaintiff: 1) whether plaintiff was a member of a limited and specifically definable group; 2) whether defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) whether the risk to plaintiff was obvious or known; 4) whether defendant acted recklessly in con-

scious disregard of that risk; and 5) if such conduct, when viewed in total, "shocks the conscience" of federal judges. *Id.*

To bring the *Uhlrig* test in line with *DeShaney*, the Tenth Circuit later held in *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir.1998) that "in addition to meeting *Uhlrig's* five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased the danger in some way." *Id.* at 1263; *accord Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d 1226, 1238 (10th Cir.1999) (noting that danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger"). If, however, a plaintiff is unable to meet the five *Uhlrig* requirements, a court need not reach the question of the state's role in causing or enhancing the danger to the plaintiff. *Armijo*, 159 F.3d at 1263, fn. 6. I address Plaintiff's claim in light of these controlling legal principles.

i. First *Uhlrig* element—Member of Limited and Specifically Definable Group

■ Plaintiff contends he was a member of a limited and specifically definable group—those students shot and seriously injured students in the Library. Plaintiff has met this element of the *Uhlrig* test.

ii. Second *Uhlrig* element—Risk of Serious, Immediate and Proximate Harm

■ Claim Five is based not only on the Command Defendants' failures to act but also on their instructions to persons in the Library, including Plaintiff, to stay put and assurances to them that help was on the way. For the reasons set out in *Schnurr*, under the circumstances of this case,

Plaintiff's allegations can be construed fairly to meet the second element of the *Uhlrig* test that the Command Defendants' affirmative actions on April 20, 1999 enhanced the danger that he would be attacked by Harris and Klebold. By ordering the SWAT teams and rescue units to not enter Columbine for several hours after Harris and Klebold committed suicide, the Command Defendants also enhanced the danger that his injuries would be aggravated and his suffering increased.

iii. Third *Uhlrig* Element—Obvious or Known Risk

▇ Plaintiff does not allege that the Command Defendants knew specifically that he had been shot in the Library and was in need of medical treatment. It is alleged, however, that the Command Defendants knew that emergency medical treatment was needed for persons in the Library. *See* C/O ¶ 208. Thus, Plaintiff's allegations can be construed fairly to meet the third *Uhlrig* element.

iv. Fourth *Uhlrig* Element—Reckless Actions in Conscious Disregard of the Risk

▇ For a claim of recklessness to be cognizable under § 1983, the state actor must manifest either an intent: 1) to harm; or 2) to place a person unreasonably at risk of harm." *Uhlrig*, 64 F.3d at 573. The Due Process clause does not protect citizens "against incorrect or ill-advised [government] decisions." *Seamons*, 84 F.3d at 1236 *quoting Collins*, 503 U.S. at 120, 112 S.Ct. 1061.

The first type of recklessness conforms to the outlines of traditional intentional torts, while the second is defined as "when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and *unreasonable* disregard of the consequences.'" *Uhlrig*, 64 F.3d at 574

*quoting Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir.1992)(emphasis added).

▇ Pursuant to *Uhlrig*, there are no factual allegations supporting the inference that these Defendants harbored an intent to harm Plaintiff. *See id.* at 574. Rather, Plaintiff alleges that at some point after Harris and Klebold killed themselves, a SWAT team entered the School's north entrance, *see* C/O ¶ 133. Based on the exigent circumstances facing the Command Defendants, including the need to clear the School of potential attackers and potential explosives, *see* Command Defendants' Response Brief, p. 12, I cannot conclude that the decisions made and implemented by the Command Defendants were unreasonable. *See Medina*, 960 F.2d at 1496. Consequently, Plaintiff's allegations are insufficient to demonstrate that the Command Defendants acted recklessly in conscious disregard of the risk that Mr. Ireland's injuries would be aggravated and his suffering increased. Thus, this *Uhlrig* factor has not been met.

v. Fifth *Uhlrig* Element—"Conscience Shocking" Conduct

▇ The fifth *Uhlrig* element requires that a defendant's conduct, when viewed in total, must be "conscience shocking" to the court. To "shock the conscience," a plaintiff must do more than show that the government intentionally or recklessly caused or enhanced the danger facing a plaintiff by abusing or misusing government power. The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. *Uhlrig*, 64 F.3d at 574.

In the companion case of *Sanders v. Board of County Comm'rs*, 192 F.Supp.2d 1094, I concluded that the Command Defendants' failure to provide medical aid to

Mr. Sanders shocked the conscience of this federal court. *Id.* at p. ——, 2001 WL 1808537 at pp. 15–16. The circumstances in this case are distinguishable from those presented in *Sanders.*

In *Sanders,* Columbine teacher Dave Sanders reached Science Room 3 after being shot twice in the back by Klebold near the School cafeteria. It was alleged that from approximately 12:30 p.m. when the Command Defendants learned that Harris and Klebold were dead until 4:00 p.m. when a SWAT team reached Mr. Sanders, the Command Defendants knew Mr. Sanders' exact location and the nature of his wounds. The *Sanders* Complaint alleged that during this time, despite repeated communications with the Science Room 3 occupants apprising them of Mr. Sanders' grave and deteriorating condition, the Command Defendants took repeated affirmative actions to block access to or rescue of Mr. Sanders by private citizens or other state actors. *See Sanders* Memorandum Opinion and Order, p. ——, 2001 WL 1808537 at *15. These actions included forbidding the Science Room occupants from breaking exterior windows to get help for Mr. Sanders and physically preventing a teacher from leaving the School to obtain help. *See id.* at pp. —— – ——, 2001 WL 1808537 at *18.

Here, in contrast, Plaintiff has not alleged that the Command Defendants knew: 1) that he was in the Library; 2) that he was injured; or 3) the nature and extent of his injuries. Moreover, there are no allegations that the Command Defendants stymied specific attempts to obtain medical aid for Plaintiff.

█ Furthermore, Plaintiff has not alleged that the Command Defendants harbored an intent to harm him unjustified by any government interest. Consequently, for the reasons set out in *Schnurr* based on *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), I conclude that the alleged actions and inactions on the part of the Command Defendants faced with a volatile emergency situation the scope and nature of which was unknown and unprecedented, fail to shock the conscience of this court in the constitutional substantive due process sense. *See Lewis,* 523 U.S. at 849, 118 S.Ct. 1708; *Radecki v. Barela,* 146 F.3d 1227 (10th Cir.1998).

Plaintiff has not met the fourth and fifth *Uhlrig* elements. Consequently, the Command Defendants are entitled to dismissal of Claim Five based on danger creation/enhancement theory.

Even if Claim Five asserts violations of substantive due process, qualified immunity necessarily attached for the reasons stated in *Schnurr,* § VI, 189 F.Supp.2d at 1124–25.

**C. *Claim Six*—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against individual Sheriff Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John or Jane Does 51–100, in their individual capacities, based on failure to remedy subordinates'/colleagues' deprivations of constitutional rights**

█ The proper test for holding a supervisor liable for the unconstitutional conduct of subordinates under § 1983 requires allegations of personal direction or of actual knowledge and acquiescence in conduct alleged to have violated the constitutional rights of a citizen. *Woodward v. City of Worland,* 977 F.2d 1392, 1400 (10th Cir.1992) *cert. denied,* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). *See also Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (supervisor liability requires an "affirmative link [between the supervisor and the subordinate] ... showing [the supervisor's] au-

thorization or approval of such misconduct"); *McClelland v. Facteau*, 610 F.2d 693, 696 (10th Cir.1979) (same).

■ Plaintiffs allege that the Command Defendants issued "command and/or supervisory directives causing, and/or knowingly acquiescing in commanded personnel's ... deprivation of Patrick Ireland's constitutional rights...." C/O ¶ 213. Thus, the first *Woodward* element is met.

Based on the analysis of Claim Five, however, Plaintiff has not made an initial showing of an underlying constitutional violation on the part of the Command Defendants. Thus, Plaintiff has not met the second essential element of a supervisory liability claim. *See Woodward*, 977 F.2d at 1400. The Command Defendants are entitled to dismissal of Claim Six.

Assuming Claim Five asserts violations of Plaintiff's rights to substantive due process, the Command Defendants state they are entitled to qualified immunity. I agree for the reasons stated in *Ruegsegger v. Jefferson County Bd. of County Comm'rs*, Case. No. 00–B–806, 197 F.Supp.2d 1247, 1262–1264, § VI which are incorporated by reference into this Memorandum Opinion and Order.

D. ***Claim Two***—**42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department, based on inadequate policies, practices, and training.**

■ Claim Two asserts that the Jefferson County Sheriff's Department, former Sheriff Ronald Beckham, in his official capacity, and Sheriff John Stone, in his official capacity violated Plaintiff's substantive due process rights by failing to implement adequate policies or adequately train the Sheriff's deputies so as not to violate Plaintiff's constitutional rights. *See* C/O

¶¶ 161–62. Liability does not attach to the governmental entity pursuant to § 1983 for the acts of its employees unless the Plaintiff can show: 1) that a municipal employee committed a constitutional violation; and 2) a municipal policy or custom was ·the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998).

### 1. Constitutional Violation

Plaintiff has not made the requisite predicate showing of an underlying constitutional violation as to Claim Two against the Sheriff Defendants. *See* §§ (V)(A–C), *supra*. Therefore, Plaintiff cannot meet this element. Assuming, however, a constitutional violation, I assess the second element also.

### 2. Policies, Procedures, Custom, or Training as Moving Force

■ A governmental entity or its policy makers may be liable pursuant to § 1983 if there is a failure to adequately train employees and that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Myers*, 151 F.3d at 1317. A governmental entity " 'is only liable when it can be fairly said that the city itself is the wrongdoer.' " *Collins*, 503 U.S. at 122, 112 S.Ct. 1061.

■ As in *Castaldo*, I conclude that Harris and Klebold were the "moving force" behind Plaintiff's injuries. Plaintiff's allegations that his injuries could have been avoided if there were different policies in place or adequate training do not state a viable claim.

## VI.

### Claims against School Defendants

A. *Claim Three*—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against Howard Cornell, individually based on creating or substantially enhancing the danger faced by Plaintiff and special relationship

Plaintiff alleges that Defendant Cornell was responsible for enacting policy relating to the enforcement of student behavior and discipline at Columbine. *See* C/O ¶ 172. He alleges that "various District R–1 employees knew of or suspected Harris' and Klebold's hateful and violent tendencies." C/O ¶ 82. The Complaint does not allege specifically that Mr. Cornell was one of the "various District R–1 employees" that were privy to the information about Harris and Klebold. For purposes of analysis, however, I assume that Mr. Cornell acquiesced in Harris' and Klebold's conduct by "repeatedly failing and refusing to address [their] threatening and menacing behavior." *See id.* at ¶ 171.

■ Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *See DeShaney,* 489 U.S. at 197, 109 S.Ct. 998. Absent a special relationship or Mr. Cornell's creation of the danger that Plaintiff faced, there is no constitutional duty to protect. *See id.*

■ In the Tenth Circuit, school officials have no constitutional duty to protect students based on mandatory school attendance from the private actions of third parties. *See Graham,* 22 F.3d at 994–95; *Maldonado,* 975 F.2d at 732. This is true even when public officials know of an individual's capacity for violence. *See Graham,* 22 F.3d at 994–95 (no duty despite school's prior knowledge of specific threats of violence against student); *Armijo,* 159

F.3d at 1261 (no duty to protect student with known suicidal ideation from self-inflicted harm).

1. Special Relationship

■ Pursuant to *DeShaney,* "[t]he affirmative duty to protect arises *not from the State's knowledge of the individual's predicament* ... but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998. (emphasis added). Unlike criminal incarceration and involuntary commitment to a mental health facility, public education does not impose a sufficient limitation upon students' freedom to act to create a special relationship. *See Vernonia School Dist.,* 515 U.S. at 655, 115 S.Ct. 2386; *Seamons,* 84 F.3d at 1236; *Graham,* 22 F.3d at 994. *See also O'Hayre v. Board of Educ.,* 109 F.Supp.2d 1284, 1289 (D.Colo.2000).

■ Plaintiff does not allege that Mr. Cornell placed limitations upon his freedom to act at any time. Under these circumstances, as a matter of law, no special relationship existed between Mr. Cornell and Plaintiff.

2. State–Created or Enhanced Danger

To determine whether Plaintiff has stated a danger creation/enhancement claim, I apply the *Uhlrig* factors in light of his allegations.

a. First *Uhlrig* Element—Member of Limited and Specifically Definable Group

Plaintiff contends that as a Columbine High School student, he was a member of a limited and specifically identifiable group. Citing *Sutton,* in which the victim was a deaf, blind, and mute student who required personal assistance and *Armijo,*

in which the victim was a mentally unstable student with suicidal ideations, Mr. Cornell argues that Plaintiff did not possess some characteristic by which he was identified apart from the shooting or that rendered him vulnerable to the attack. I do not view this element so narrowly here.

▆▆▆ Based on Harris' and Klebold's writings, videotapes, and statements, apparently the only characteristic necessary to be the object of their rage was to be a Columbine High School student at school on April 20, 1999. Although in this case the group was large, it was specific to Columbine High School students rather than students at any high school. Plaintiff has met the first *Uhlrig* element.

b. Second *Uhlrig* Element—Substantial Risk of Serious, Immediate, and Proximate Harm

Mr. Cornell cannot dispute that the harm at issue was serious. Rather, he contends that the risk facing Plaintiff was neither immediate nor proximate.

▆▆▆ *Graham* teaches that the risk must be of a limited duration, not merely that a person may act violently in the future. *Id.* at 995. The events that unfolded happened over many months rendering it impossible for Plaintiff to meet this element.

c. Third *Uhlrig* Element—Obvious and Known Risk

▆▆▆ The risk framed by Plaintiff's Complaint was that Harris and Klebold would act on their unfulfilled plans to violently harm students at Columbine High School. Pursuant to the allegations that Mr. Cornell: 1) knew for more than a year before the attack that Harris and Klebold

talked about blowing up the School; and 2) was aware of the contents of Harris' website well before April 20, 1999, I conclude that Plaintiff has met this element.

d. Fourth *Uhlrig* Element—Conscious Disregard of an Obvious or Known Risk

▆▆▆ This element requires that Mr. Cornell was subjectively aware of the risk at hand. *See Uhlrig,* 64 F.3d at 573 n. 8 (recklessness requires proof that defendant focused on the risk and deliberately assumed or acquiesced in such risk); *Archuleta v. McShan,* 897 F.2d 495, 499 (10th Cir.1990) ("[R]ecklessness includes an element of deliberateness—a conscious, acceptance of a known, serious risk."). Pursuant to the allegations as to Mr. Cornell, I again conclude that Plaintiff has met this element.

e. Fifth *Uhlrig* Element—"conscience shocking" conduct

Under this element, I assess conduct from two perspectives—both of which occurred under non-emergency circumstances.

▆▆▆ Assuming Plaintiff's allegations as true, *see Tonkovich,* 159 F.3d at 510, Mr. Cornell ignored ominous information about Harris and Klebold. As discussed in *Lewis,* 523 U.S. 833, 118 S.Ct. 1708, where circumstances require instant judgment, no substantive due process claim can lie unless the officials' conduct was "tainted by an improper or malicious motive." *Id.* at 855, 118 S.Ct. 1708. Where as here, however, Mr. Cornell had the time to truly deliberate, something less than intent to harm, such as calculated indifference, may shock the conscience of the Court. *See id; Radecki,* 146 F.3d 1227.

In this case, there was no emergency. Pursuant to Plaintiff's allegations, Mr. Cornell had ample time to consider the information he allegedly possessed about Harris and Klebold. *See Lewis,* 523 U.S. 833, 118 S.Ct. 1708. I evaluate the factual allegations set out previously as measured against the circumstances in relevant cases in determining whether Mr. Cornell's conduct is "conscience shocking."

In *Martinez,* 77 F.3d 1253, a teacher who allegedly called a twelve-year-old student a prostitute in front of her class over a period of several weeks and allowed other students to do the same engaged in an obvious abuse of authority and flagrant misconduct. Yet this conduct was not shocking to the Court's conscience. In *Garcia v. Miera,* 817 F.2d 650 (10th Cir. 1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) a nine-year-old student was held upside down by a teacher and beaten on the legs with a split wooden paddle by the principal resulting in bleeding, a welt, a two-inch cut, and a permanent scar. This behavior was held to be conscience shocking.

As illustrated by these cases, whether or not a defendant's conduct was found shocking to the conscience of the Court, there was affirmative conduct by a defendant that directly and immediately resulted in severe physical or psychological injuries to another person or allowed such harm to occur or to continue. Here, however, Plaintiffs' claims are based on allegations that Mr. Cornell failed to anticipate and prevent *future* behavior by Harris and Klebold. I conclude that Mr. Cornell's alleged actions of omission fail to rise to the level of "conscience shocking" in a constitutional sense. *See Lewis,* 523 U.S. at 852–53, 118 S.Ct. 1708; *Radecki,* 146 F.3d 1227.

Because Plaintiff has not met all of the *Uhlrig* factors, Mr. Cornell is entitled to dismissal of Claim Three.

**B. *Claim Four*—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security against Jefferson County School District R–1, for inadequate policies, customs, practices, and training**

Pursuant to Claim Four, Plaintiff asserts that the Jefferson County School District R–1 relied on various District R–1 policymakers in violating his substantive due process rights by failing to formulate adequate policies, customs, practices and training to Columbine High School staff. *See* C/O ¶ 191.

Under *Monell v. New York City Dep't. of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the School District may not be held liable pursuant to § 1983 unless one of the School District's employees committed a constitutional violation and a School District policy or custom was the moving force behind the constitutional deprivation. *See id.* at 695, 98 S.Ct. 2018. *See also, Myers v. Oklahoma Cty. Bd. of County Comm'rs,* 151 F.3d 1313, 1317 (10th Cir.1998). This rule applies to failure to train claims. *See Myers,* 151 F.3d at 1317.

Plaintiff has not made the requisite predicate showing of an underlying constitutional violation. Therefore, Plaintiff cannot meet this element. In addition, Harris and Klebold were the "moving force" behind Plaintiff's injuries. Plaintiff's allegations that his injuries could have been avoided if there were different policies in place or adequate training fail to state a claim upon which relief may be granted.

## VII.

### Claims against Municipal Defendants

A. *Claim Seven*—42 U.S.C. § 1983—Municipal Liability against Defendants The Board of County Commissioners of the County of Jefferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado, based on acts of policymaker Sheriff Stone in his official capacity-deliberate indifference to deprivation of civil rights

Plaintiff alleges that the Municipal Defendants are liable under § 1983 for Sheriff Stone's acts on April 20, 1999 made in his official capacity as final policymaker in law enforcement matters for the Board and the Sheriff's Department. Claim Seven arises from the lack of rescue attempts despite assurances that help was on the way.

 In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court enunciated the rule for imposing liability on a governmental entity:

a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 695, 98 S.Ct. 2018. The policy need not be formal or written. *Id.* at 691, 98 S.Ct. 2018. *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

 A single act of an employee may be imposed on a local governmental entity if the employee possesses final authority to establish policy with respect to the challenged action. *See Jett v. Dallas Indep.*

*Sch. Dist.*, 491 U.S. 701, 736–38, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107(1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Ware v. Unified Sch. Dist. No. 492*, 902 F.2d 815, 817 (10th Cir.1990). Therefore, a local governmental entity such as the Board and the Sheriff's Department may be held liable for decisions made by officials who have authority under state law to speak as final decisionmakers on the particular issue. *See Jett*, 491 U.S. at 737, 109 S.Ct. 2702.

 It is alleged that Sheriff Stone was a final policymaker in law enforcement matters for Jefferson County, represented by the Board, and for the Sheriff's Department. *See C/O ¶ 220*. Liability does not attach to the governmental entity pursuant to § 1983 for the acts of its employees, including those with final authority, unless a plaintiff can show: 1) that a municipal employee committed a constitutional violation; and 2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998). The policy need not be formal or written. *Id.* at 691, 98 S.Ct. 2018. *See also Adickes*, 398 U.S. at 167–68, 90 S.Ct. 1598. Proving moving force requires showing a "direct causal link between the action and deprivation of federal rights." *Lopez v. LeMaster*, 172 F.3d 756, 763 (10th Cir.1999).

1. Constitutional Violation

 Plaintiff has not made the requisite predicate showing of an underlying constitutional violation as to Claims One, Five and Six. Therefore, Plaintiff cannot meet this element. Assuming, however, a constitutional violation, I assess the second element also.

## 2. Moving Force

■ A governmental entity or its policy makers may be liable pursuant to § 1983 if the entity's policies or customs are the cause or the "moving force" behind the underlying constitutional deprivation. *See Myers*, 151 F.3d at 1317. A governmental entity " 'is only liable when it can be fairly said that the city itself is the wrongdoer.' " *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). It is only when the "execution of a government's policy or custom ... inflicts the injury" that the governmental entity or its policy makers may be held liable under § 1983. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

Here, Harris and Klebold were the "moving force" behind Plaintiff's injuries. Plaintiff's allegations that his injuries could have been avoided if there were different policies in place or adequate training do not state a viable claim.

B. **Claim Eight—42 U.S.C. § 1983— Municipal Liability against Defendants The Board of County Commissioners of the County of Jefferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado, based on acts of policymaker Sheriff Stone in his official capacity-failure to prevent witnessed constitutional violations**

■ Plaintiff alleges that the Municipal Defendants are liable under § 1983 for Sheriff Stone's acts, in his official capacity as final policymaker in law enforcement matters for the Board and the Sheriff's Department arising from his failure and refusal to correct or remedy his subordinates' wrongful disregard of the risk on April 20, 1999 that he would be shot and injured, despite assurances of help. *See* C/O ¶ 229. Allegedly, this failure constituted the approval of the Municipal Defen-

dants as a matter of municipal policy or custom.

As set out above, Plaintiff has not met the requisite predicate showing of an underlying constitutional violation concerning: 1) Sheriff Stone's alleged failure to correct or remedy the responding Sheriff Defendants' wrongful acts; or 2) that the responding Sheriff Defendants violated Plaintiff's constitutional rights. And, again, Harris and Klebold were the moving force behind Plaintiff's injuries. The Municipal Defendants are entitled to Rule 12(b)(6) dismissal of Claim Eight.

## VIII.

## Claims against Gun Show Defendants

A. **Claim Nine—Negligence against Defendants Ronald F. Hartman and James R. Washington**

■ Plaintiff alleges that at the Gun Show, Defendants Hartman and Washington sold Klebold the shotgun that either Harris or Klebold shot him with in the Library on April 20, 1999. *See* C/O ¶¶ 21, 232. In addition, he alleges that these Defendants instructed Klebold how to cut down the barrel of the shotgun. *Id.* at ¶ 232. Based on these allegations, Plaintiff alleges that Mr. Hartman and Mr. Washington were negligent in enabling Klebold to purchase the shotgun. In his response brief, Plaintiff characterizes Claim Nine as a negligent entrustment claim. In Colorado, negligent entrustment is a part of the general law governing liability for negligence. *See Casebolt v. Cowan*, 829 P.2d 352, 355 (Colo.1992).

■ Under Colorado law, to recover for the negligent conduct of another, a plaintiff must establish: 1) the existence of a legal duty owed to the plaintiff by the defendant; 2) breach of that duty; 3) injury to the plaintiff; and 4) actual and proxi-

mate causation. *Leake v. Cain*, 720 P.2d 152, 155 (Colo.1986).

### 1. Duty

 "The court determines, as a matter of law, the existence and scope of [any] duty...." *Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313, 317 (Colo.1980). *See Perreira v. State*, 768 P.2d 1198, 1208 (Colo.1989). If the law imposes no duty of care under the circumstances, a negligence claim cannot be sustained even though injury may have occurred. *University of Denver v. Whitlock*, 744 P.2d 54 (Colo.1987).

 The question whether a duty should be imposed in a particular case is "essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987). Generally, a person does not have a duty to prevent a third person from harming another unless a special relationship exists between the defendant and the wrongdoer or between the defendant and the victim. *Leake v. Cain*, 720 P.2d 152 (Colo.1986) *citing* Restatement (Second) of Torts § 315. *See also Solano v. Goff*, 985 P.2d 53 (Colo.App. 1999).

### 2. Special Relationship between Defendants and Plaintiff or Harris and Klebold

 Special relationships are predicated on "some definite relation between the parties of such a character that social policy justifies the imposition of a duty to act." *Whitlock, supra*, 744 P.2d at 58. Under Colorado law, the issue of a duty to foresee the criminal behavior of a third party has been analyzed in three general areas: 1) buyer and seller; 2) owner and patron (premises liability); and 3) prisoner and law enforcement agency or patient and mental health care provider. In all three areas, whether a defendant owes a duty of care to prevent injury to others is a threshold question of law. *Smith v. City and County of Denver*, 726 P.2d 1125 (Colo.1986).

Under Plaintiff's allegations, I analyze the relationship between a buyer and seller to determine if there was a special relationship between these Defendants and Harris and Klebold warranting imposition of a duty of care.

In *Hilberg v. F.W. Woolworth Co.*, 761 P.2d 236 (Colo.App.1988), *overruled in part on other grounds, Casebolt v. Cowan*, 829 P.2d 352, the only Colorado case addressing gun sellers and buyers, a child was injured by a rifle which was given to a friend by the friend's father. An action was brought against the manufacturer and the retailer. The Hilbergs pursued an appeal from summary judgment denying their claims of negligence *per se*, negligent entrustment and negligent failure to exercise due care with respect to Defendants F.W. Woolworth Company and its employee, William Jack Myers. Plaintiff also appealed the dismissal of the claims of negligent failure to exercise due care and strict liability in tort against Defendant Savage Industries, Inc., the manufacturer of the .22 caliber rifle sold by a Woolworth employee to Mr. Johnson for use by Mr. Johnson's 14–year–old son, Jeff. Plaintiff Robert P. Hilberg, a minor child, was injured when he was accidentally shot by his friend Jeff Johnson with the .22 rifle. F.W. Woolworth and its agents knew that Mr. Johnson intended to give the rifle to his minor son as a Christmas present.

The Hilbergs argued that reasonable and due care should have been taken particularly when the employees who sold the firearm knew, or had reason to know, that Mr. Johnson's purchase of the rifle was a Christmas present for his minor son. In

finding no special relationship and, therefore, no duty, the Court concluded:

> Generally, if a person should reasonably foresee that his act, or failure to act will involve an unreasonable risk of harm to another, there arises a duty to avoid such harm; however, there is no duty to prevent a third person from harming another absent a special relationship.

*Hilberg,* 761 P.2d at 239 *citing Leake v. Cain,* 720 P.2d 152.

Plaintiff alleges that Mr. Hartman and Mr. Washington not only sold the gun to Harris and Klebold by means of a "straw man purchase" knowing them to be minors, but also advised them how to saw off the barrel of the shotgun. Thus, this case is distinguishable from *Hilberg* because the *Hilberg* defendants had "no specific knowledge concerning the competence, maturity, judgment or propensity for carelessness or recklessness of either [the purchaser] or his son." *See Hilberg,* 761 P.2d at 238–39.

The Colorado Supreme Court has stated that:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier know or has reasons to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Casebolt v. Cowan,* 829 P.2d 352, 357 (Colo. 1992) (quoting Restatement (Second) of Torts § 390 (1965)).

▉▉ Defendant Hartman contends that the theory of negligent entrustment does not apply to a legal sale of merchandise. Under the circumstances alleged, I disagree. Colorado courts have acknowledged that the theory of negligent entrustment as set out in Restatement (Second) of Torts § 390 applies to anyone who supplies a chattel for the use of another, including sellers. *See Peterson v. Halsted,* 829 P.2d 373, 378 (Colo.1992).

Defendant Washington contends that Harris' and Klebold's criminal acts were an intervening cause of Plaintiff's injures. *See* Washington Brief, p. 22. I again disagree under the circumstances alleged.

▉▉▉ Where the circumstances make it likely that a defendant's negligence will result in injuries to others and where this negligence is a substantial factor in causing the injuries sustained, proximate causation is satisfied. The intervening or superseding act of a third party, in this case Harris and Klebold, including a third-party's intentionally tortious or criminal conduct does not absolve a defendant from responsibility if the third-party's conduct is reasonably and generally foreseeable. *See Ekberg v. Greene,* 196 Colo. 494, 496–97, 588 P.2d 375, 376–77(1978).

There is no question that Harris and/or Klebold injured Plaintiff. The issue is whether Harris' and Klebold's intentional criminal acts constitute a superseding cause of the harm inflicted by them, thus relieving Defendant Washington of liability.

▉▉ A superseding cause exists when: 1) an extraordinary and unforeseeable act intervenes between a defendant's original tortious act and the injury or harm sustained by plaintiffs and inflicted by a third party; and 2) the original tortious act is itself capable of bringing about the injury. Just as foreseeability is central to finding that a duty is owed, it is also "the touchstone of proximate cause" and of the superseding cause doctrine. *Walcott v. Total Petroleum, Inc.,* 964 P.2d 609 (Colo.App.1998). *See also Smith v. State Compensation Ins. Fund,* 749 P.2d 462, 462–63 (Colo.App.1987); *Ekberg,* 588 P.2d

at 376. An intentionally tortious or criminal act of a third party does not break the causal chain if it is reasonably foreseeable. *Smith,* 749 P.2d at 464, *Ekberg,* 588 P.2d at 376. A superseding cause relieves the original actor of liability when "the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." *Webb v. Dessert Seed Co.,* 718 P.2d 1057, 1062–63 (Colo. 1986) (quoting Restatement (Second) of Torts § 442B).

Here, Defendants Washington and Hartman are alleged to have provided Klebold with a shotgun and advised him how to saw off the barrel. Plaintiff alleges that Harris and/or Klebold shot him in the head with the shotgun provided to Klebold by these Defendants. Thus, to determine whether Harris' and Klebold's intervening criminal actions relieved Mr. Washington and Mr. Hartman of liability, I determine whether their actions were within the scope of the risk created by their conduct.

Restatement (Second) of Torts, § 442A provides that:

> [w]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.

*Id.*

Although the question is a close one, applying these principles to the allegations in this case, I conclude that the harm inflicted by Harris and Klebold was within the scope of the risk created by Defendants' conduct in providing Klebold with a shotgun and advising Harris and Klebold how to saw off the barrel of the gun. It is alleged that the Defendants knew that Harris and Klebold were minors and they sought Defendants' advice on how to alter the shotgun by shortening the length of the barrel.

No Colorado case has addressed whether a third party's intervening acts relieve an actor of liability. In *Cowart v. Kmart Corp.,* 20 S.W.3d 779 (Tex.App.2000), *cert. denied,* Sept. 28, 2000, the survivors of a person (Cowart) killed in a shooting incident brought a wrongful death action against Kmart who sold ammunition to a 17 year old minor that another person (Bell) used to shoot and kill Plaintiff's decedent. Pursuant to a summary judgment motion, Kmart asserted that Bell's criminal conduct was an intervening and superseding cause of Cowart's death. In granting summary judgment, the Court concluded that Bell's conduct was a superseding cause of Cowart's death because Kmart could reasonably assume that a 17 year old minor was old enough to appreciate the danger of misuse of ammunition. *See id.* at 784. Also, the Court held that Kmart: 1) could reasonably assume that a minor would obey the laws; and 2) could not foresee that its sale of ammunition to a minor would result in Bell's negligent or intentional misuse of the ammunition. *Id.* Significantly, there was no evidence of any fact that should have alerted Kmart that the minor would put the ammunition in the hands of someone who would engage in criminal conduct. *Id.* at 786. Thus, there was no evidence that Kmart could foresee that the ammunition would be used for a criminal purpose. *Id.*

*Cowart* is distinguishable from this case. I must accept as true that Mr. Washington and Mr. Hartman: 1) provided the shotgun to Klebold; 2) instructed Harris and Klebold how to saw off the shotgun barrel; and 3) knew that Harris and Klebold were minors. *See Maher v. Durango Metals,* 144 F.3d at 1304. At this stage of the case and under these circumstance, in contrast to *Cowart,* I conclude that Defendants could not reasonably assume that Harris and Klebold

would obey the laws and not misuse the shotgun. Consequently, although the precise criminal acts committed by Harris and Klebold may not have been foreseeable, it was reasonably foreseeable that the Defendants' conduct would result in the intentional misuse of the shotgun. Thus, Harris' and Klebold's conduct does not, as a matter of law, relieve Mr. Washington and Mr. Hartman of liability for Plaintiff's injuries. Defendants Washington and Hartman are not entitled to dismissal of Claim Nine.

B. *Claim Ten*—Negligence against Defendant James D. Tanner d/b/a Tanner Hunting and Fishing Shows f/k/a Tanner Gun Shows

1. Facts

Plaintiff alleges that Mr. Tanner operates gun shows in the Denver metropolitan area at which all manner of firearms and other weapons are sold. *See* C/O ¶ 235. In the winter of 1998, Mr. Tanner conducted a gun show at the Denver Merchandise Mart at which the shotgun used to injure Plaintiff was sold. *See id.* at ¶ 95. According to the Complaint, Mr. Tanner failed to impose reasonable security precautions to guard against the foreseeable risk of minors purchasing and/or obtaining firearms at the gun show. *See* C/O ¶ 236.

2. Analysis

Again, under Colorado law, to recover for the negligent conduct of another, a plaintiff must establish: 1) the existence of a legal duty owed to the plaintiff by the defendant; 2) breach of that duty; 3) injury to the plaintiff; and 4) actual and proximate causation. *Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986).

a. Duty

 "The court determines, as a matter of law, the existence and scope of [any] duty...." *Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.

1980). *See Perreira v. State,* 768 P.2d 1198, 1208 (Colo.1989). If the law imposes no duty of care under the circumstances, a negligence claim cannot be sustained even though injury may have occurred. *University of Denver v. Whitlock,* 744 P.2d 54 (Colo.1987). Generally, a person does not have a duty to prevent a third person from harming another unless a special relationship exists between the defendant and the wrongdoer or between the defendant and the victim. *Leake v. Cain,* 720 P.2d 152 (Colo.1986) *citing* Restatement (Second) of Torts § 315. *See also Solano v. Goff,* 985 P.2d 53 (Colo.App.1999).

i. Special Relationship between Defendant Tanner and Plaintiff or Harris and Klebold

Plaintiff does not allege the existence of a special relationship between Defendant Tanner and himself or Harris and Klebold. Therefore, I conclude that there was no special relationship among these persons.

b. Causation

 Defendant Tanner states that in the absence of a special relationship, he owed Plaintiff no duty. For purposes of further analysis, I assume Defendant Tanner owed a duty of care to Plaintiff. Even assuming a duty, Defendant Tanner argues that he was not the legal cause of Plaintiff's injuries. I agree.

In the context of Plaintiff's Claim Ten, Plaintiff's injuries were inflicted by Dylan Klebold and/or Eric Harris. *See* C/O ¶ 21. To conclude that Defendant Tanner's conduct produced Plaintiff's injuries requires connecting "if ... then ..." propositions which are speculative at best.

 Alleged tortious conduct must also be a "substantial factor" in producing the injury. *See North Colo. Medical Ctr. v. Committee on Anticompetitive Conduct,* 914 P.2d 902, 908 (Colo.1996); *Smith v.*

*State Compensation Ins. Fund,* 749 P.2d 462, 464 (Colo.App.1987). If an event other than the defendant's alleged conduct appears predominant, the defendant's conduct cannot be a substantial factor. *North Colo. Medical Ctr.,* 914 P.2d at 908; *Smith v. City and County of Denver,* 726 P.2d 1125 (Colo.1986).

■■■ "Colorado's proximate cause rule is intended to ensure that casual and unsubstantial causes do not become actionable." *North Colorado Medical Center,* 914 P.2d at 908. Even if Mr. Tanner's actions contributed in some way to Plaintiff's injuries, as to Claim Ten Harris' and Klebold's actions on April 20, 1999 were the predominant, if not sole, cause of his injuries. As a result, as a matter of law, Defendant Tanner's conduct was not a legal cause of Mr. Ireland's injuries.

Accordingly, IT IS ORDERED that:

1. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim One is GRANTED;

2. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Two is GRANTED;

3. Defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Three is GRANTED;

4. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Four is GRANTED;

5. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Five is GRANTED;

6. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Six is GRANTED;

7. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Seven is GRANTED;

8. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Eight is GRANTED;

9. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Nine is DENIED;

10. Defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Ten is GRANTED;

11. Claim One against Defendant Sheriffs Beckham and Stone and the Investigating Defendants, in their individual capacities, is DISMISSED;

12. Claim Two against Defendant Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department is DISMISSED;

13. Claim Three against Defendant Cornell, in his individual capacity is DISMISSED;

14. Claim Four against the Jefferson County School District R–1 is DISMISSED;

15. Claim Five against the Command Defendants, in their individual capacities, is DISMISSED;

16. Claim Six against the Command Defendants, in their individual capacities, is DISMISSED;

17. Claim Seven against the Board of County Commissioners of the County of Jefferson, Colorado and The Sheriff's Department of the County of Jefferson, Colorado is DISMISSED;

18. Claim Eight against the Board of County Commissioners of the County of Jefferson, Colorado and The Sheriff's Department of the County of Jefferson, Colorado is DISMISSED;

19. Claim Ten against Defendant James D. Tanner d/b/a Tanner Hunting and Fishing Shows f/k/a Tanner Gun Show is DISMISSED; and

20. the Defendants whose claims are dismissed herein are GRANTED COSTS

 

upon submission of a bill of costs within 10 days of the date judgment enters.