**Ted Anthony NIZIOL and Annette Niziol, Plaintiffs,**

v.

**DISTRICT SCHOOL BOARD of PASCO COUNTY, Florida; Arthur O'Donnell; Bob White; and Joe Little, Defendants.**

No. 8:01CV2147T27MSS.

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 9, 2002.

Wendolyn S. Busch, Janette Meredith Wester, Mechanik, Nuccio, Bentley, Williams & Hearn, P.A., Lutz, FL, for Ted Anthony Niziol, Individually and as personal representative of the estate of Ted Anthony Niziol, II, deceased, plaintiff.

Joe A. McClain, Dennis J. Alfonso, McClain & Alfonso, P.A., Dade City, FL, for Pasco County District School Board, defendant.

D. Andrew DeBevoise, Thomas W. Poulton, Kathleen Ann Meagher Krak, DeBevoise & Poulton, P.A., Winter Park, FL, for Bob White, Sheriff of Pasco County, Florida, in his official capacity, defendant.

Charles P. Campbell, Jr., Shumaker, Loop & Kendrick, Tampa, FL, for WTSP–TV, movant.

## ORDER

SCRIVEN, United States Magistrate Judge.

This cause came on for consideration of Motion to Dismiss by Sheriff White and Corporal Little (Dkt.3), Motion to Dismiss by Defendants District School Board and Arthur O'Donnell (Dkt.6), Motion for Qualified Immunity Protective Order or Stay of Discovery by Defendant Corporal Little (Dkt.8) and Motion for Qualified Immunity Protective Order or Stay of Discovery by Defendant Arthur O'Donnell (Dkt.9). The Undersigned held oral argument on the above motions on May 9, 2002. Notices of supplemental authority citing recent Supreme Court law were filed by Defendants on June 24, 2002, (Dkts. 24 & 25) and July 1, 2002, (Dkt.26).

## I. FACTUAL BACKGROUND

Plaintiffs, Ted Niziol and Annette Niziol, individually and as Personal Representatives of the Estate of their deceased son Ted Anthony Niziol, II ("Mr.Niziol"), filed a 10–count complaint on January 4, 2001. This complaint arises from a tragic incident that occurred on January 19, 2000, when Mr. Niziol, a student at Ridgewood High School in Pasco County, was killed with a handgun that he brought onto the school campus. Specifically, Plaintiffs al-

lege 1) a Violation of the Gun–Free Schools Act against The District School Board of Pasco County, Florida (Count I); 2) a Violation of the Gun–Free Schools Act against Principal Arthur O'Donnell (Count II); 3) a Denial of Substantive Due Process against Bob White, Sheriff of Pasco County (Count III); 4) a Denial of Substantive Due Process against School Resource Officer Corporal Joe Little (Count IV); 5) a Denial of Procedural Due Process against Bob White, Sheriff of Pasco County (Count V); 6) a Denial of Procedural Due Process against Corporal Joe Little (Count VI); 7) a Claim of Wrongful Death against The District School Board of Pasco County (Count VII); 8) a Claim of Wrongful Death against Bob White, Sheriff of Pasco County (Count VIII); 9) a Claim of Wrongful Death against Principal Arthur O'Donnell (Count IX); and 10) a Claim of Wrongful Death against Corporal Little (Count X). The facts alleged to support these counts are as follows:

On the morning of January 19, 2000, prior to the first period of the school day, Mr. Niziol informed his friend Andrew Enerson, also a student at the school, that he had a .22 caliber handgun in his car. Another student, Samantha Lang, also learned from Mr. Niziol about the handgun and was afraid that the gun might be sold to another student named Marty who would use the gun to kill Lang's boyfriend Enerson. Long wrote a note to Mr. Niziol during first period that stated: "Hi Teddy. So what is this crap about you selling Marty a gun b/c if I get shot I'm gonna be mad. Also what does he need for to shoot Andrew n e-ways." Mr. Niziol replied on the face of the note "I'm not selling Marty a gun. I'm trying to sell it to Joey."

Lang gave the note to Enerson, and Enerson handed the note to his second period teacher Danita Williams and asked to be excused from class to report the note to the principal, Defendant O'Donnell.

Williams showed the note to another teacher, Jennifer Apel, and asked Apel to watch her class so she could go with Enerson to the principal's office. Williams and Enerson delivered the note to principal O'Donnell around 9:10 a.m. and O'Donnell read the note. While O'Donnell was discussing the note with Enerson, Defendant Corporal Joe Little ("Cpl. Little"), Ridgewood High's School Resource Officer, came into O'Donnell's office, but O'Donnell did not inform Cpl. Little about the note or the gun. Rather, O'Donnell kept the note and told Enerson that he would handle the matter and that Enerson should return to class.

That same morning, Enerson's parents came to the school for a previously scheduled meeting with the school guidance counselor, Glenn Cable. Enerson informed his parents about the situation and told them that he was afraid for his life. Enerson's parents discussed the matter with the counselor. The counselor told Enerson's parents that he would speak with principal O'Donnell and Cpl. Little about the situation. Enerson's parents requested that their son be released from school, but Enerson told his parents and the counselor that he did not want to leave because it would appear suspicious to his peers and they might assume he had informed school officials about the situation.

At about 11:00 a.m., the counselor saw Cpl. Little in the school cafeteria and told him about the situation. The counselor identified Lang, Enerson and another student, Steven Moschella, to Cpl. Little in the cafeteria. Cpl. Little told the counselor that he would handle the situation.

At some point during the morning (the complaint does not specify time), the note was placed on Cpl. Little's desk. At about 12:30 p.m. Cpl. Little met with principal O'Donnell to discuss the situation. At about 1:15 p.m., Cpl. Little questioned the

student referred to as "Joey" in the note. Joey denied any knowledge about the gun. Cpl. Little did not question Mr. Niziol, Lang, Enerson, or Moschella, and no other students were interviewed by any of the school officials.

At about 1:00 p.m., Cpl. Little's assistant, Rupal Patel, also a student at the school and a friend of Mr. Niziol's, reviewed the note that he found lying on Cpl. Little's desk. Patel saw Mr. Niziol in the hallway between classes and told him that Cpl. Little had a note on his desk with Mr. Niziol's name on it that talked about a gun being in Mr. Niziol's car. Mr. Niziol then ran to the parking lot, removed the gun from his car, hid it in the bushes on school property nearby, and returned to his last class.

At about 2:00 p.m., Mr. Niziol met his sister, Nicolette Niziol, and three other students in the parking lot. Mr. Niziol retrieved the gun from its hiding place and the five students got into Mr. Niziol's car. His sister sat in the front seat and Mr. Niziol sat in the driver's seat. Another student, Kristofer Kirby, approached the car as it sat idling. At about 2:10 p.m., Steven Moschella, who was sitting in the back seat of the car directly behind Mr. Niziol, picked up the gun to show it to Kirby and the gun discharged. A bullet fired from the gun, pierced the driver's seat and entered Mr. Niziol's body. Mr. Niziol exited the car and collapsed on the pavement in the parking lot. He died approximately one hour later at North Bay Hospital in New Port Richey, Florida. Mr. Niziol's parents brought suit in this Court seeking redress against the school board, school officials and Sheriff office employees for the loss of their son. The Defendants have moved to dismiss for failure to state a claim for which relief can be granted.

On these pleadings it should be noted at the outset that this Court is not being called upon to consider whether the circumstances presented by these facts were tragic. Anyone viewing them would have to concede that they were. Nor is the Court being asked on these motions to consider simply who is to blame for this tragedy. Indeed, there is blame enough to share. Rather, the distinct and, therefore, limited inquiry presented here is whether federal remedies under the Constitution of the United States and/or federal statutory law have been properly invoked by these pleadings. It has been astutely observed that the presence of laws does not guarantee remedies for every wrong. For the reasons that follow, the Court finds that axiom apropos of these pleadings insofar as the *federal* remedies sought by Plaintiffs are concerned.[1] No constitutional claim or federal statutory claim can be sustained on Plaintiffs' complain as pled.

## II. STANDARD FOR MOTION TO DISMISS

In ordering this dismissal, the Court is mindful that it cannot dismiss a complaint unless it appears, "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To survive a motion to dismiss, a plaintiff may not merely "label" his or her claims. *See Blumel v. Mylander,* 919 F.Supp. 423, 425 (M.D.Fla.1996). At a minimum, the Federal Rules of Civil Procedure require a "short and plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99 (quoting Fed. R.Civ.P. 8(a)(2)).

---

1. As noted herein, the Court declines to address whether state law provides a remedy or cause of action on these facts. (See *infra* at Section IV).

In deciding a motion to dismiss, the court can only examine the four (4) corners of the complaint. *See Rickman v. Precisionaire, Inc.,* 902 F.Supp. 232 (M.D.Fla. 1995). The threshold sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *See Ancata v. Prison Health Serv., Inc.,* 769 F.2d 700, 703 (11th Cir.1985) (citation omitted). In addition, a court must accept the plaintiff's well pled facts as true and construe the complaint in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Howry v. Nisus, Inc.,* 910 F.Supp. 576 (M.D.Fla.1995). However, when on the basis of a dispositive issue of law, no construction of the factual allegations of the complaint is appropriate. *See Executive 100, Inc. v. Martin County,* 922 F.2d 1536 (11th Cir.1991); *Powell v. United States,* 945 F.2d 374 (11th Cir.1991).

With this standard in mind, the Court considers each of Defendants' challenges as set forth in the motions to dismiss. Specifically, Defendants move to dismiss all Defendants and all counts, contending that these allegations, even if true, are insufficient as a matter of law to state a cause of action for which relief can be granted to the Plaintiffs. Defendants assert that dismissal is appropriate because: 1) there is no underlying constitutional right giving rise to substantive and due process protections owed by Defendants O'Donnell and Little; 2) even if there were an underlying constitutional right, Defendants O'Donnell and Little are entitled to qualified immunity as to Plaintiffs' claims of substantive and procedural due process violations because there was no clearly established law at the time of the alleged violation that made it clear that Defendants' conduct was unlawful; 3) there is no private right of action under the Gun–Free Schools Act; and 4) there is no general duty giving rise to state law claims for wrongful death against all Defendants.

## III. HAVE PLAINTIFFS ALLEGED A COGNIZABLE CONSTITUTIONAL VIOLATION AGAINST ANY DEFENDANT?

### A. Did the School Board or Principal O'Donnell violate the Gun–Free Act as alleged by Plaintiffs in Counts I and II?

■ Plaintiffs contend that Defendants failed to maintain and/or implement a policy regarding guns and other weapons on campus, in violation of the Gun–Free Schools Act. Specifically, Plaintiffs assert that the School Board violated the Act when it remained deliberately indifferent to the presence of a gun on campus when the Board knew there was a gun, where it was, and who possessed the gun. Plaintiffs maintain that in this circumstance the Gun–Free Schools Act, codified in 20 U.S.C. § 8921(b)(1) (1994), created a federal right for Plaintiffs enforceable under 42 U.S.C § 1983 as they were intended beneficiaries of the Act.

Defendants argue that the Gun–Free Schools Act creates no private right of action for Plaintiffs based on the plain language of the statute. In this regard, Defendants assert that no portion of the Act provides for rules and/or procedures on how States and/or local educational agencies are to investigate possible violations by students, or provides for guidelines to be utilized by the chief administering officer of such local educational agency for implementing expulsion for violations of the Gun–Free Schools Act.

The Gun–Free Schools Act of 1994 (the "Act") provides that:

Each state receiving federal funds under this chapter shall have in effect a state law requiring local educational agencies to expel from school for a period of not less than one year a student who is determined to have brought a weapon to

a school under the jurisdiction of local educational agencies in that State[.]

20 U.S.C. § 8921(b)(1).

Section 8921(d)(1) of the Act also requires that any school board requesting funds made available to the State pursuant to the Act must, in its application requesting the funds, assure the State that it is in compliance with the State law required by subsection (b) of the Act.

> Section 8922(a) of the Act provides that: No funds shall be made available under this chapter to any local educational agency unless such agency has a policy requiring referral to the criminal justice or juvenile delinquency system of any student who brings a firearm or weapon to a school served by such agency.

20 U.S.C. § 8922(a).

▬ The Supreme Court has recently foreclosed this cause of action. *See Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). In that case, a former Gonzaga University student brought § 1983 claims alleging violations of the Family Educational Rights and Privacy Act (FERPA). In a clear and concise decision, the Supreme Court held that spending legislation that imposes duties on the recipients of federal funds does not automatically confer a private cause of action on persons benefitting from those funds. "[U]nless Congress 'speak[s]' with a clear voice,' and manifests an 'unambiguous' intent to create individually enforceable rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga University*, 122 S.Ct. at 2270 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 28, and n. 21, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). The High Court continued:

> Although the question whether a statutory violation may be enforced through § 1983 is a different inquiry from that involved in determining whether a private right of action can be implied from a particular statute, the inquiries overlap in one meaningful respect—in either case it must first be determined whether Congress intended to create a federal right. For a statute to create private rights, its text must be phrased in terms of the persons benefitted.
> ***
> [W]here a statute provides no indication that Congress intends to create new individual rights, there is no basis for a private suit under § 1983.

*Id.* at 2270 (internal citations omitted).

The FERPA's provisions considered in *Gonzaga University* speak to the Secretary, directing that "[n]o funds shall be made available" to any "educational ... institution" which has a prohibited "policy or practice." 20 U.S.C. § 1232g(b)(1). The Supreme Court confirmed that the "focus [of the FERPA] is two steps removed from the interests of individual students and parents and clearly does not confer the sort of individual entitlement that is enforceable under § 1983." *Gonzaga University*, 122 S.Ct. at 2271. The "individually focused rights-creating language ... is critical." *Id.* at 2270–71.

In the instant case, § 8921 of the Gun–Free Schools Act does create a right, but one in favor of the States for the receipt of Federal funds under certain circumstances. It does not expressly and unambiguously create a private right in any individuals who benefit from the program funded by the legislation. The unambiguous language of the Act establishes that "[n]o funds shall be made available under this chapter to any *local educational agency.*" (emphasis added). It is clear, that the intended remedy for a violation of the Act is that federal funding could be denied. Thus, the Gun–Free Schools Act at issue here lacks the critical individual directed language. It must follow, therefore that,

in this case, there is no basis for a private suit under § 1983 arising from the Gun-Free Schools Act. *See Gonzaga University*, 122 S.Ct. at 2270–71. Accordingly, the counts of Plaintiffs' complaint alleging violation of the Gun–Free Schools Act 42 U.S.C. § 1983 against Defendants School Board (Count I) and Principal O'Donnell (Count II) must be dismissed.

B. *Did Plaintiffs sufficiently assert a Substantive Due Process violation against Cpl. Little and Sheriff White in Counts III & IV?*

Plaintiffs maintain that Defendant Cpl. Little, the school resource officer, and Defendant White, the Sheriff under whose authority Cpl. Little performed his duties, were at all times relevant here, acting under color of law pursuant to the rules the Sheriff's office and/or the statutes and regulations of the State of Florida. Plaintiffs contend that Sheriff White and Cpl. Little violated Mr. Niziol's substantive due process rights by failing to investigate the presence of a gun, secure the gun and expel Mr. Niziol.

Defendants first argue that the substantive due process claim against Cpl. Little sounds in simple negligence and does not rise to the level of conduct proscribed by the United States Constitution. Moreover, Defendants argue that Cpl. Little had no duty to protect Mr. Niziol while in school.

Defendants further argue that if the allegations of the complaint do not establish an underlying constitutional violation by Cpl. Little, then under *Monell v. Dept. Of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), any claim against Sheriff White should also be dismissed.

In support of their substantive due process claims, Plaintiffs allege the following: Cpl. Little, an employee of the Pasco County Sheriff's Office, was assigned as Ridgewood High's School Resource Officer. In this capacity, by at the latest 11:00 a.m. on the morning of the shooting, Cpl. Little had been advised of the potential presence of a hand gun on campus. Plaintiffs allege that Cpl. Little had hours to contemplate the appropriate course of action with regard to the gun, but he chose to take no action other than to briefly interview one student whom Plaintiffs alleged was only tangentially involved. This conduct, Plaintiffs contend, was wanton, reckless and intentional, and in callous disregard of and deliberately indifferent to Mr. Niziol's constitutional rights. Plaintiffs allege that Cpl. Little's conduct created an environment of special danger for Mr. Niziol, shocks the conscience and thereby invokes constitutional liability.

Additionally, Plaintiffs maintain that Cpl. Little and Mr. Niziol had a "special relationship" that arose 1) from Cpl. Little's position as the School Resource Officer at Ridgewood High; 2) from his assumption of responsibility to investigate the gun allegation during conversations with both the guidance counselor and Principal O'Donnell; and 3) from his taking the initial step of interviewing one student about the gun. Given that purported "special relationship," Plaintiffs argue that Cpl. Little's failure to act concerning the gun also gives rise to constitutional liability under § 1983.

Plaintiffs allege that Defendant White assigned his deputy, Cpl. Little, to serve as a School Resource Officer at Ridgewood High and that Defendant White knew that Cpl. Little was highly likely to face situations involving guns and other weapons on campus as part of his normal duties. Plaintiffs allege that Defendant White failed to maintain and/or implement a policy regarding handguns on school campuses and failed to train Cpl. Little regarding the methods necessary to protect students if such contraband was brought onto campus. Further, Plaintiffs contend that De-

fendants White's and Little's conduct was intentional and deliberately indifferent to Mr. Niziol's constitutional rights and created an environment of special danger for Mr. Niziol that shocks the conscience.

### 1. *Fourteenth Amendment—Due Process Clause*

The Fourteenth Amendment to the United States Constitution explicitly guarantees to each citizen that no state shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const., amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment guarantees the right of appropriate procedural process, not implicated in this case, before a state can act to deprive an individual of his or her life, liberty, or property. The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

■ The statute through which a violation of substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution is remedied is 42 U.S.C. § 1983. This Amendment was designed to provide a method for redress of violations of the rights protected under the Fourteenth Amendment by state actors. Its purpose was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial." *Mitchum v. Foster,* 407 U.S. 225, 238–40, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

■ While implemented to provide a method of redress for the deprivation of

life, liberty or property by state action, neither § 1983 nor the Fourteenth Amendment transforms mere tortious acts into constitutional violations. *Daniels,* 474 U.S. at 332, 106 S.Ct. 662, 88 L.Ed.2d 662; *McKinney v. Pate,* 20 F.3d 1550, 1556 (11th Cir.1994) (en banc) ("tort law remains largely outside the scope of substantive due process jurisprudence"). Further, neither § 1983 nor the Fourteenth Amendment confers an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Section 1983 is merely the vehicle by which the constitutional violation travels to Federal Court.

■ In order to state a substantive due process claim under 42 U.S.C. § 1983, a Plaintiff must allege: 1) that an act or omission deprived Plaintiff of a right, privilege or immunity secured by the Constitution or laws of the U.S.; and 2) that the act or omission was done by a person acting under color of law.

The Supreme Court has cautioned against expanding the concept of substantive due process. *See Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) ("[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (citations omitted).

### 2. *DeShaney Decision*

■ In *DeShaney,* the Supreme Court announced the now firmly entrenched rule

that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect individuals from private violence. *See De-Shaney*, 489 U.S. at 195–97, 109 S.Ct. 998, 103 L.Ed.2d 249. In that case, the Winnebago County Department of Social Services (the County) received numerous reports that Joshua, a small child, was being abused by his father. *Id.* at 192–93, 109 S.Ct. 998, 103 L.Ed.2d 249. Joshua, temporarily removed from his father's custody, was soon returned to his father's care. *Id.* The County continued to receive reports that Joshua was being abused by his father but failed to act. *Id.* Eventually, it was alleged that Joshua's father beat him so severely that he suffered permanent brain damage. *Id.* Joshua and his mother sued the County and several of its employees, alleging that the County had violated the Substantive Due Process Clause of the Fourteenth Amendment by failing to intervene on Joshua's behalf and protect him from his father's abuse. *Id.*

The *DeShaney* Court rejected plaintiffs' argument that the County assumed from its knowledge of the father's actions. Relying on the premise that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protects them from each other," the Court held that:

> [N]othing in the ... Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Consistent with these princi-

ples, ... the Due Process Clause[ ] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual. *Id.* at 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249.

Two exceptions have emerged over the years to *DeShaney's* general rule that a state is not constitutionally obligated to protect individuals against private violence. Courts refer to these exceptions as 1) the special-relationship doctrine, and 2) the state-created or enhanced danger doctrine. *See Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir.1995), *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Powell v. Georgia Dept. of Human Resources*, 114 F.3d 1074, 1079 (11th Cir. 1997); *Mitchell v. Duval County School Board*, 107 F.3d 837, 838–40 (11th Cir. 1997). The Supreme Court has also recognized that conduct which "shocks the conscience" in a constitutional sense may in some circumstances be sufficient to establish a basis for a substantive due process deprivation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992); *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

a. *Special Relationship Doctrine*

The special-relationship doctrine stems directly from *DeShaney* itself and applies in situations in which the state imposes limitations upon an individual's freedom to act on his or her own behalf. In *DeShaney*, the Court stated:

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause,

not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. 998, 103 L.Ed.2d 249; *see also City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (duty to provide medical care to injured suspects in police custody); *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (duty to protect involuntarily committed mental patients from harm by themselves and others).

 Additionally, the Eleventh Circuit in *White v. Lemacks*, noted:

[I]t appears that the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise ˙from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves.

183 F.3d 1253, 1257 (11th Cir.1999).

 To bring the claim within the ambit of the special relationship exception, Plaintiffs have alleged that Mr. Niziol was required to attend Ridgewood High subject to compulsory attendance requirements of law and that this gave rise to a custodial relationship between him and the state actors against whom the claim is brought. As the Eleventh Circuit noted in *Wright v. Lovin*, "every federal circuit court of appeal that has addressed the question of whether compulsory school attendance laws create the necessary custodial relationship between school and student to give rise to a constitutional duty to protect students from harm by non-state actors has rejected the existence of any such duty." 32 F.3d 538, 540 (citing *Dorothy J. v. Little Rock School Dist.*, 7 F.3d 729 (8th Cir.1993); *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3rd Cir.1992) (en banc), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *Maldonado v. Josey*, 975 F.2d 727 (10th Cir.1992), *cert. denied*, 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); and *J.O. v. Alton Community Unit School Dist. 11*, 909 F.2d 267 (7th Cir.1990).

The Eleventh Circuit continued:

According to these circuits, mere compulsory attendance laws do not result in the level of custody envisioned by the Supreme Court in *DeShaney*. These circuits reason that mandatory attendance at a public high school simply does not restrict one's liberty in the same sense that incarceration in prison or involuntary commitment in a mental institution does.

*Wright*, 32 F.3d at 540.

Despite this clear authority, Plaintiffs attempt to establish a special relationship between Defendants and Mr. Niziol contending that Mr. Niziol's mandated school attendance created a custodial relationship or "special relationship." Plaintiffs rely on dicta in *Davis v. Monroe County Bd. of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). In *Davis* the Supreme Court permitted a private damages action to proceed against a school board under Title IX in a case of alleged student-on-student sexual harassment. Plaintiffs argued that *DeShaney* was, to some extent, overruled by *Davis* in light of the dictum in which the Court noted that schools may exercise "a degree of supervision and control that could not be exercised over free adults," and its statement that school officials "may be held responsible under state law for their failure to protect students from the tortious acts of third parties." *Davis*, 526 U.S. at 646, 119 S.Ct. at 1673 (citing *Vernonia School Dist. v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564).

Plaintiffs reliance on *Davis* in the context of the instant case is misplaced. *Davis* is inapplicable to this case first because, contrary to Plaintiffs' assertion, *Davis* does not address substantive due process under the Fourteenth Amendment and the contours established in *DeShaney*. Rather, *Davis* addresses liability pursuant to Title IX, which proscribes discrimination on the basis of gender and grants a remedy to "any person" deprived of their rights. *See* 20 U.S.C. § 1681(a).

Second, the Supreme Court did not evince any intention of restricting its holding in *DeShaney* when it wrote of the custodial relationship between schools and students. In fact, in regard to the referenced dicta, the Court cited *Acton* in which it previously reiterated its holding in *DeShaney*, stating that "we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Acton*, 515 U.S. at 655, 115 S.Ct. 2386 (citing *DeShaney* 489 U.S. at 200, 109 S.Ct. 998).

Tragic as the circumstances in this case are, consistent with the controlling legal authority, this Court is constrained to conclude that no special relationship existed between Plaintiffs and Cpl. Little. Cpl. Little's alleged nonfeasance in the face of specific information which Plaintiffs suggest mandated action does not invoke the protections of the Due Process Clause. "Inaction by the state in the face of a known danger is not enough to trigger the obligation; according to *DeShaney* the state must have limited in some way the liberty of a citizen to act on his own behalf." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).

### b. State–Created or Enhanced Danger Doctrine

■ The *DeShaney* Court also left room for a second exception to the general rule that the state has no duty to protect citizens from private violence. That exception, known as the state-created or enhanced danger doctrine, originated from the High Court's finding that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998, 103 L.Ed.2d 249. The *Deshaney* Court noted that where the "State knew that Joshua faced a special danger of abuse at his father's hands ... [t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." 489 U.S. at 197, 203, 109 S.Ct. at 1004, 1007.

Although the *DeShaney* Court planted the seed for this second exception, it did not identify what state conduct "creates or enhances" danger sufficient to establish a duty to protect. The Tenth Circuit addressed directly the state-created or enhanced danger doctrine in *Graham v. Independent Sch. Dist. No. I–89*, 22 F.3d 991, 994 (10th Cir.1994), a case concerning acts of violence at two schools. At one school, a student was shot and killed by another student. At the other school, a student was stabbed by a fellow student. *See id.* The students' parents brought separate § 1983 actions against their respective School Districts.[2]

■ The *Graham* Court held that schools have no duty under the Due Process Clause to protect students from as-

---

**2.** While both cases were not consolidated, they were dealt with jointly on appeal because of the similarity of the issues involved.

saults by other students, even when the school knew or should have known of the danger presented. *See id.* at 994–95. The Court noted that *"DeShaney* ... le[ft] the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." *See id.* (citing *Reed,* 986 F.2d at 1125 and *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993)). The Court stated, however, that "[this state-created danger] doctrine necessarily involves *affirmative conduct* on the part of the state in placing the plaintiff in danger." *Graham,* 22 F.3d at 995 (emphasis added). Inaction by the state actor in the face of a known danger is not enough to trigger a constitutional duty to protect. *See id.*

Instructive on this point are the cases that arose from the well-publicized and tragic Columbine High School massacre that occurred on April 20, 1999. *See Ireland v. Jefferson County Sheriff's Dep't,* 193 F.Supp.2d 1201 (D.Colo.2002); *Castal-* *do v. Stone,* 192 F.Supp.2d 1124 (D.Col. 2001); *Sanders v. Board of County Comm'rs,* 192 F.Supp.2d 1094 (D.Colo. 2001); *Schnurr v. Board of County Comm'rs,* 189 F.Supp.2d 1105 (D.Colo. 2001); *Ruegsegger v. Jefferson County Board of County Comm'rs,* 2001 WL 1808532 (D.Colo.2001); *Ruegsegger v. Jefferson County School District R–1,* 187 F.Supp.2d 1284 (D.Colo.2001). These lawsuits were initiated by parents of slain high school students, representatives of teachers and other school personnel, and injured students and teachers alleging § 1983 violations and negligence claims against several defendants including the county's Sheriff Department, its employees, the Sheriff individually, and the School District. Despite compelling facts alleging gross mishandling of events leading up to this tragedy, all of these cases, barring one, were dismissed by the District Court as insufficient to state a claim and as barred by qualified immunity.[3]

**3.** Eric Harris and Dylan Klebold, the Columbine High School students who committed the horrendous acts and subsequently committed suicide, had previously been under investigation after the Sheriff's office received a complaint from a Jefferson County citizen that Eric Harris often talked about making pipe bombs and using them to kill numerous people and that Klebold knew Harris' bomb making activity. *See Ireland v. Jefferson County Sheriff's Dep't,* 193 F.Supp.2d 1201, 1209–10 (D.Colo.2002). The Sheriff's office knew that Harris maintained a web site containing death threats including statements that Harris and Klebold were planning to use pipe bombs, other explosive, and guns to kill numerous people. *See id.* at 1210. Columbine's Resource Officer, and other school and Sheriff's office personnel received a copy of the website printout and had seen or had information available to them about bizarre, hate-filled and threatening behavior of Harris and Klebold, including video tapes made by both students showing them in possession of and discharging firearms in a mock attack killing Columbine students. *See id.* Harris' web site was later amended to include the phrase "Preparing for the big April 20! You'll all be sorry that day." *See id.* at 1211. The Sheriff's department allegedly took initial steps to prepare and obtain a search warrant in connection with Harris' and Klebold's activities but later aborted the investigation. *See id.* Accepting these facts as true in all the lawsuits, the District Court concluded that Defendants did not have a special relationship with Plaintiffs, that the officers and school district were not liable under the state-created or enhanced danger doctrine, and that Harris and Klebold were the "moving force" behind Plaintiffs' injuries. *See Ireland v. Jefferson County Sheriff's Dep't,* 193 F.Supp.2d 1201 (D.Colo.2002); *Castaldo v. Stone,* 192 F.Supp.2d 1124 (D.Col.2001); *Schnurr v. Board of County Comm'rs,* 189 F.Supp.2d 1105 (D.Colo.2001); *Ruegsegger v. Board of County Comm'rs,* 2001 WL 1808532 (D.Colo. 2001); *Ruegsegger v. Jefferson County School District R–1,* 187 F.Supp.2d 1284 (D.Colo. 2001). The District Court Judge dismissed all the above cited cases except the *Sanders* case. *See Sanders v. Board of County Comm'rs,* 192 F.Supp.2d 1094 (D.Colo.2001).

Though not controlling, the facts alleged in the *Sanders* case are particularly instructive here.

The *Sanders* case was brought by the personal representative of William Sanders, a Columbine teacher. It involved the following distinct facts alleged by Plaintiff: 1) Mr. Sanders was wounded while assisting several students and teachers to safety from the assailants; 2) Defendants knew of Mr. Sanders deteriorating condition and exact location and also knew, by no later than 12:30 p.m., that Harris and Klebold lay dead in the library; 3) Nonetheless, Defendants foreclosed the use of available fire trucks, ladders and equipment to achieve direct entry through the Science Room's exterior southwest windows to rescue him; 4) Defendants prohibited paramedics and other emergency medical personnel from going to his aid; 5) Defendants barred the SWAT units from attempting a surgical entry into the Science Room from the roof or through one of the exterior doors beneath it; 6) Sadly, by 4:00 p.m., Mr. Sanders' apparently survivable wounds had become fatal and he died. Based on these factual allegations, the District Court of Colorado concluded that at some point between 12:30 and 4:00 p.m. that afternoon, the Defendants in charge of the command post gained the time to reflect and deliberate on their decisions. The Court noted that the command Defendants not only cut off all private avenues of rescue but also forbade the resources at their command from coming to the aid of Mr. Sanders for more than three hours. Therefore, the Court concluded that Plaintiff had properly asserted a violation of the Fourteenth Amendment right to substantive due process under the state-created danger doctrine. *See Sanders,* 192 F.Supp.2d at 1114.

The facts surrounding Mr. Niziol's death as alleged by Plaintiffs and viewed in the light most favorable to them simply do not rise to the level of indifference seen in *Sanders.* The facts as pled here establish that Mr. Niziol was accidentally shot by another student using a gun that Mr. Niziol brought to school, a gun that he first stored in his car and later deliberately hid in the bushes and then retrieved at the end of school. The failings in Cpl. Little's "investigation" if it can be called that, left Mr. Niziol in the same position he was in when he first arrived on campus with the weapon. This Court cannot discern from any of the facts alleged any affirmative actions by the Defendants that created or increased the danger to Mr. Niziol. Absent allegations that Cpl. Little created or enhanced the danger that Mr. Niziol faced, there is no constitutional duty to protect, and Plaintiffs claims in this regard must fail.

### c. *Conscience-shocking conduct*

▪ Plaintiffs' attempt to establish that Cpl. Little's conduct "shocks the conscience" in a constitutional sense also fails. The Supreme Court has recognized that government officials may be found in violation of citizens' substantive due process rights where the officials' conduct "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992). Analyzing *Collins,* the Eleventh Circuit noted that "when someone not in custody is harmed because too few resources were devoted to their safety and protection, that harm will seldom, if ever, be cognizable under the Due Process Clause." *White v. Lemacks,* 183 F.3d 1253, 1258 (11th Cir.1999).

▪ The Supreme Court has noted that:

> We have ... rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the

Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.

*County of Sacramento v. Lewis,* 523 U.S. 833, 848–49, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998) (citing *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)).

Conscience-shocking conduct giving rise to constitutional protection has been more readily found in custodial situations involving prisoners or cases involving physical brutality. In custodial situations, courts reason that "forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. These situations necessarily involve affirmative actions on the part of state actors. "When the States takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that renders him unable to care for himself, and at the same time fails to provide for his basis human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action by the ... Due Process Clause." *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005 (citation and footnote omitted).

Exemplar cases point to the extreme level of conduct required to shock the conscience of the courts under this standard. *See e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (police pumped suspect's stomach in search of evidence); *Jones v. Wellham,* 104 F.3d 620 (4th Cir.1997) (plaintiff raped by uniformed police officer); *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981) (police officer struck plaintiff with a nightstick in retaliation for plaintiff photographing police officer); *Aldridge v. Mullins,* 377 F.Supp. 850 (M.D.Tenn.1972), *aff'd,* 474 F.2d 1189 (6th Cir.1973) (police officer shot a fleeing suspect's legs without any probable cause other than suspect running and failing to stop).

The District Court in the *Sanders* case cited above also found that the Defendants' conduct in that case shocked the conscience of the court because Defendants had taken repeated affirmative actions to block access to or rescue of Mr. Sanders by private citizens or other state actors not withstanding his readily-accessible location. The Court concluded that Defendants' conduct shocked the court's conscience as the Defendants demonstrated a deliberate indifference towards Sanders' plight. *See Sanders,* 192 F.Supp.2d at 1114. By comparison, the alleged actions and omissions by Cpl. Little, though inexcusable if true, fail to shock the conscience of this Court in a Fourteenth Amendment substantive due process constitutional sense. *See Lewis,* 523 U.S. at 852–53, 118 S.Ct. 1708, 140 L.Ed.2d 1043.

### 3. *Derivative claim against Sheriff White*

Plaintiffs allege that Sheriff White's liability under the substantive due process clause derives from his failure to establish proper policies regarding guns on school campuses and to properly train Cpl. Little how to respond to the presence of guns on school campuses.

Defendants are correct that an inquiry into a governmental entity's (Sheriff White in his official capacity) custom or policy is relevant only when a constitutional deprivation has occurred. *See Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir.1996)

(citing *Vineyard v. County Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir.), *cert. denied*, 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993) ("[o]nly when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise.")) Thus, before addressing whether Sheriff White can be held liable for his alleged failure to train Cpl. Little or for failure to establish proper policies regarding guns on school campuses, the Court must first determine whether Cpl. Little violated any of Mr. Niziol's constitutional rights by failing to discharge some constitutional duty owed directly to him. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1065, 117 L.Ed.2d 261 (1992); *Wyke v. Polk County School Board*, 129 F.3d 560, 569 (11th Cir.1997).

Because the Court has determined that Cpl. Little's conduct did not cause Plaintiffs to suffer a constitutional deprivation, there is no need to inquire into Plaintiffs' assertion that the Sheriff's failure to establish proper policies regarding guns on school campuses and to properly train Cpl. Little on how to respond to the presence of guns on school campuses. Therefore, the non-existence of a constitutional deprivation by Cpl. Little as analyzed in Section B above requires that Count III against Sheriff White also be dismissed.

D. *Did Plaintiffs sufficiently assert a Procedural Due Process violation against Sheriff White and Cpl. Little in Counts V and VI?*

 Plaintiffs additionally allege that by failing to take any action to remove the gun from the school's campus, Sheriff White and Cpl. Little deprived Mr. Niziol of his right to life and bodily integrity without the procedural due process protection offered by the Constitution.

Defendants argue that there was no deprivation of a constitutional right by the Defendants for which Mr. Niziol was entitled to a pre-deprivation hearing and thus no procedural due process violation on their part. More specifically, Defendants rightly assert that the Constitution does not contemplate any procedural rights in advance of an accidental shooting.

In order to state a procedural due process claim, a Plaintiff must show that he was deprived of a constitutional right without due process of law. There are two distinct elements in this regard. First, there must be a deprivation of a constitutionally protected liberty or property interest. Second, there must be a denial of adequate procedural protections. *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir.2001).

Plaintiffs again rely on the *Davis* case as support for the first element of their procedural due process claim. Plaintiffs argue that *Davis* makes clear that a decision by school officials not to act in the face of a known threat itself constitutes conduct which can be the basis of constitutional liability. As noted earlier, however, Plaintiffs reliance on *Davis* is misplaced. *Davis* is inapplicable to this case because it does not address the appropriate inquiry of duty under the Fourteenth Amendment and the contours established in *DeShaney*. Rather, *Davis* addresses liability pursuant to Title IX, which expressly proscribes discrimination on the basis of gender and grants redress to persons deprived. *See* 20 U.S.C. § 1681(a). It does not impose a general duty upon schools to protect students from actions of third parties or from their own conduct. Thus, Plaintiffs have failed to establish that there is a constitutionally protected right in the first instance.

Even if Plaintiffs were able to show that there was a deprivation of a constitutionally protected liberty or property interest, their procedural due process argument would fail for lack of the second element.

Plaintiffs are unable to point to, and the Court is unable to find, any case that supports their argument that Defendants' failure to investigate gives rise to a procedural due process claim.

Defendants note that in the 1994 *Wright v. Lovin* case, 32 F.3d 538, the Eleventh Circuit dismissed without discussion similar claims of procedural due process violations. That case involved a mother's Section 1983 action against her son's school and various individuals at the school on claims that Defendants were liable when her son was killed in a car accident that occurred when he and a friend left a voluntary summer school session in violation of school rules.

The Eleventh Circuit affirmed the District Court's entry of summary judgment finding that the school did not violate the son's substantive due process rights. Regarding the District Court's entry of summary judgment in favor of the school on the claim of procedural due process, the Court simply stated that Plaintiff's "arguments on this issue are totally without merit and warrant no further discussion." *Id.* at 541.

In this case, Plaintiffs have likewise failed to allege facts sufficient to support a claim for deprivation of procedural due process under the Constitution nor could any such claim be asserted under any facts. Accordingly, Counts V and VI must be dismissed for failure to state a claim.

### E. *Are Cpl. Little and Principal O'Donnell entitled to Qualified Immunity?*

█ Two of the Defendants, Cpl. Little and Principal O'Donnell, have been sued in their individual capacities. These Defendants should be dismissed from this action because each enjoys qualified immunity from the allegations asserted here.[4]

Plaintiffs maintain that as the principal of the school, Defendant O'Donnell was the top authority figure whose duties included investigating and responding to reports of weapons on campus. They contend that the Gun–Free Schools Act of 1994 ("the Act"), 20 U.S.C. § 8921, constituted clearly established law as to the duties and potential liability of state actors. Pursuant to the Act, Plaintiffs maintain that Principal O'Donnell was required to expel for no less than one year students found with weapons on campus. Plaintiffs assert that Defendant O'Donnell was not acting within the scope of his discretionary authority when the alleged wrongful acts occurred because he failed to take appropriate action once he had knowledge of the gun's presence on campus. Additionally, Plaintiffs maintain that even if he were acting within the scope of his authority, Defendant O'Donnell would still be liable because his actions were not reasonable in light of the circumstances. These inactions, Plaintiffs contend, give rise to a claim of substantive and procedural due process violations, which may pursued under 42 U.S.C. § 1983.

As it relates to the School Resource Officer Cpl. Little, Plaintiffs maintain that the facts alleged in the complaint support a finding that he violated clearly established statutory and constitutional law of which a reasonable person would have known. Specifically, Plaintiffs argue that the Gun–Free Schools Act was enacted by Congress in an effort to keep schools safe and free from weapons, and it requires schools to expel students caught with deadly weapons on campus, keep records

---

4. As explained *supra,* the Court dismisses the constitutional claims brought against Cpl. Little because there are no underlying constitutional rights alleged in this case. Qualified immunity, therefore, serves as an alternative basis to dismiss the claims brought against Cpl. Little.

of such expulsions and forward the information to the federal government. Thus, Plaintiffs argue that a reasonable School Resource Officer would know that there is a duty to remove known weapons from campus and that the failure to do so violates students' constitutional rights to life and bodily integrity. Cpl. Little's alleged inaction in this regard, Plaintiffs argue, violated Mr. Niziol's procedural and substantive due process rights under the Constitution of the United States.

Defendants O'Donnell and Cpl. Little argue that the claims brought against them in their individual capacities (Counts II, IV, VI) should be dismissed on qualified immunity grounds because Plaintiffs failed to allege a violation of law that was clearly established at the time of the tragic incident.

 Qualified immunity protects government officials from civil suit when they have acted within their discretionary functions and have not violated a clearly established statutory or constitutional right of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity defense "embodies an 'objective reasonableness' standard, giving a government agent the benefit of the doubt," provided that the conduct was not "so obviously illegal in the light of the then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the acts. *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1366 (11th Cir.1998). This Court has posed the ultimate question as follows: "Could a reasonable [Defendant] have believed that what [he] did might be lawful in the circumstances and in the light of the clearly established law?" *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996).

 In reviewing an assertion of entitlement to qualified immunity, the Court "must first determine whether the Plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Only if this threshold determination is surmounted does the Court "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.*

 If the Court finds that there is an underlying constitutional right warranting further inquiry, then it is a plaintiff's burden to convince the Court that the law was clearly established. In doing so, it is insufficient for a plaintiff to simply identify a clearly established right in the abstract and allege that a defendant has violated it. Rather, a Plaintiff must present binding authority that has declared similar conduct in similar circumstances to be a violation of law such that "a reasonable official would understand that what he is doing violates that right." *Crosby v. Paulk,* 187 F.3d 1339, 1344 (11th Cir.1999). Although a "precise factual correlation between the then-existing law and the case-at-hand is not required," *Patrick v. Miller,* 953 F.2d 1240, 1249 (10th Cir.1992), the alleged unlawfulness must be "apparent" in light of preexisting law. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "Consequently, qualified immunity is a sharply focused, situation-bound analysis." *Crosby v. Paulk,* 187 F.3d 1339, 1345 (11th Cir.1999). That is, it must be clear to a reasonable state actor that his conduct was unlawful in the situation confronted. *Id.* If a plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit. *Hilliard,* 930 F.2d at 1518.

As explained in Sections A and B above, the Court here concludes that Plaintiffs have failed to allege facts sufficient to establish a constitutional rights violation at all. Thus, on this basis alone Defendants Little and O'Donnell are entitled to dismissal of the claims brought against them individually.

An independent basis also exists for finding that qualified immunity protects these two Defendants. As noted above, the ultimate burden is on the Plaintiff to come forward with binding law that has declared similar conduct in similar circumstances to be a violation of law such that a reasonable official would understand that what he was doing violates a Plaintiff's constitutional right. Case authority, rules and regulations and controlling legal directives may all be proffered to make this showing. *See Hope v. Pelzer*, —— U.S., at ——, 122 S.Ct., at 2511. In *Hope*, for example, to prove use of hitching post was clearly unlawful Plaintiff proffered Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation specifying procedures for using an archaic correction device and a Department of Justice report informing the ADOC of the constitutional infirmity of the use of the device.

In this case, however, Plaintiffs have failed to put forth any such parallel authority to meet this burden except the Gun–Free Schools Act. The Gun–Free Schools Act is insufficient for several reasons. The Act does not establish mandatory rules and/or procedures to investigate possible violations by students once it is suspected that there is a weapon on campus. Additionally, although the Act mandates the effectuation of a State law requiring local educational agencies to expel from school students who are determined to have brought a weapon to school, it does not set any minimum time constraints within which to order expulsion. In fact, it

grants authority to the "chief administering officer of such local educational agency" to modify the Act's expulsion requirement depending on the circumstances of each case. 20 U.S.C. § 8921(b)(1). In short, the Act fails to provide any guideline that could be construed, under the circumstances alleged here, as being clearly established so that a reasonable school resource officer in Cpl. Little's position and a reasonable school principal in Principal O'Donnell's position would have understood that their actions on the morning of January 19, 2000, violated Mr. Niziol's constitutional rights as embodied in this Act. Accordingly, the Court cannot conclude that the conduct of Cpl. Little and Principal O'Donnell constituted violations of clearly established law. For this reason also, Cpl. Little and Principal O'Donnell are entitled to qualified immunity from this suit as pled.

*IV. STATE LAW CLAIMS FOR WRONGFUL DEATH (Count VII against School Board; Count VIII against Sheriff White; Count IX against Principal O'Donnell; and Count X against Cpl. Little)*

 Plaintiffs allege that all Defendants are also liable under Florida's Wrongful Death Statute, Section 768.18 *et seq.* Because the Court dismisses Plaintiffs' federal law claims, in the interest of judicial economy, comity and fairness the Court is not inclined to exercise pendent jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c); *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir.1999). The Court is aware, however, that the running of a state statute of limitations is an important factor for this Court to consider when deciding whether to dismiss a pendent claim. *See Edwards v. Okaloosa County*, 5 F.3d 1431, 1433 (11th Cir.1993). No such problem is facially presented in this case. Because there may possibly

exist a statute of limitations issue affecting Plaintiffs' ability to file their wrongful death claims in state court, the Court simply stays consideration of the state law claims at this time. Plaintiffs are directed to submit a memorandum to the Court within twenty (20) days from the date of this order informing the Court whether there exists any statute of limitations problem preventing this case to proceed in state court if it is dismissed here.

## CONCLUSION

For the reasons outlined above, the Court finds that there are no underlying constitutional rights alleged to support Plaintiffs' substantive due process or procedural due process claims. Even if the Court could conclude that Plaintiffs have sufficiently alleged a constitutional rights violation in this case, the claims brought against Cpl. Little and Principal O'Donnell in their individual capacities must be dismissed on qualified immunity grounds because there was no clearly established law declaring the alleged conduct to be unlawful or violative of the United States Constitution. In addition, the Gun–Free Schools Act does not create a private right of action in favor of Plaintiffs and therefore any claims brought under it must also fail.

Accordingly, it is **ORDERED** that:

A) The Motion to Dismiss by Defendants Sheriff White and Corporal Little (Dkt.3) is **GRANTED in part and DENIED in part** in accordance with the foregoing; and

B) The Motion to Dismiss by Defendants District School Board and Arthur O'Donnell is **GRANTED in part and DENIED in part** in accordance with the foregoing.

It is **FURTHER ORDERED** that for the reasons outlined above:

1) Count I against the District School Board of Pasco County, Florida, is **DISMISSED;**

2) Count II against Arthur O'Donnell, is **DISMISSED;**

3) Count III against Bob White, Sheriff of Pasco County, Florida, is **DISMISSED;**

4) Count IV against Corporal Joe Little, is **DISMISSED;**

5) Count V against Bob White, Sheriff of Pasco County, Florida, is **DISMISSED;**

6) Count VI against Corporal Joe Little, is **DISMISSED;** and

7) Plaintiffs' state law based claims are **STAYED** until further instruction from this Court. Plaintiffs are directed to submit a memorandum to the Court within twenty (20) days from the date of this order informing the Court whether its dismissal of this action would prevent Plaintiffs from pursuing their claims in state court.